373 F.3d 1035
 SAFE AIR FOR EVERYONE, Plaintiff-Appellant,
v.
Wayne MEYER; William Dole; Michael Dole; Warren Dole; Jacquot Farms Enterprises, Inc.; G. Wade McClean; Terry Nichols; Satchwell Farms, Inc., Wallace Meyer; David Asher; Terrell K. Baune; Baune Farms, Inc.; Jeff Bloomsberg; Bergen Bothman; Arnold Brincken; Doug Bruce; Earl M. Clausen; Clausen Farms, Inc.; Keith Daman; Paul Daman; Denny Bros, LLC; Chad Denny; Matthew Drechsel; Drechsel Brothers, Inc.; Dennis Duncan; David Duncan; Chris Duncan; Joyce Duncan; Randy Duncan; David Fish; Thoms Freeburg; Gary French; Charles A. Hahner; Hahner Farms, Inc.; Larry Hansen; Martin Hanson; Hatter Creek Farms, Inc.; Don Hay; Larry Heaton; Clarence Heeg; Randy Holt; Duane Jenneskens; Dale R. Johnson; Ted Lacy; Phillip Lampert; Lampert Farms and Ranch, Inc.; David Lampert; Eric Larson; Brian Lashaw; Mike Lashaw; Nick Lawson; Casey Lawson; Allen Lewis; Maple Leaf Farms, Inc.; Herbert W. Millhorn; Millhorn Farms, Inc.; Bruce Mills; Catherine Morris; Richard Morrison; Elmer Ness; Erling Place; Chris R. Ramsey; Michael Roecks; Rogada Farms, Inc.; John Schultz; Karl Schultz; Joe Sievers; Ron Tee; Donald Thies; Alan Thomas; Gene Towne; Winday Hill Farms, Inc.; Todd E. Wright; Gary Wright; Wrights, Inc., Defendants-Appellees.
 No. 02-35751.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted November 4, 2003.
 Filed July 1, 2004.
 
 COPYRIGHT MATERIAL OMITTED Joel M. Gross, Arnold & Porter, Washington, D.C., for the plaintiff-appellant.
 Gary H. Baise, Baise & Miller, Washington, D.C., for the defendants-appellees.
 Jon M. Bauman, Elam & Burke P.A., Boise, ID, for amicus curiae American Lung Association of Idaho/Nevada.
 Karl T. Klein, Givens Pursley LLP, Boise, ID, for amicus curiae Idaho Medical Association, Inc.
 Appeal from the United States District Court for the District of Idaho; Edward J. Lodge, District Judge, Presiding. D.C. No. CV-02-00241-EJL.
 Before: WARDLAW, GOULD, and PAEZ, Circuit Judges.
 GOULD, Circuit Judge:
 
 
 1
 We consider whether grass residue remaining after a Kentucky bluegrass harvest is "solid waste" within the meaning of the Resource Conservation and Recovery Act ("RCRA"). Safe Air for Everyone ("Safe Air") appeals the district court's dismissal of its complaint for injunctive relief under RCRA. We conclude that the district court erred in dismissing the case on jurisdictional grounds. However, because we determine that Safe Air has failed to demonstrate that a genuine issue of material fact exists as to whether grass residue is "solid waste" under RCRA, we affirm the judgment of the district court.
 
 
 2
 * In Idaho, Kentucky bluegrass is typically planted in the spring but does not flower and produce seed until the summer of the following year. By the time the flowers have produced seed, the bluegrass plants are fifteen to thirty-six inches tall. To harvest bluegrass seed, farmers first cut the crop close to the ground to prepare the crop for combining (i.e., separating the seed from the crop). A "curing" process dries out and ripens the head of the crop. After the curing process is complete, a combine separates the seed from the straw, leaving the straw on the field. The seed is prepared for commercial distribution. However, straw and stubble (the part of the crop not cut from the ground) remain in the field. Bluegrass farmers burn these remnants, a practice called "open field burning" or "open burning." Bluegrass farmers can repeat this process for several years, depending on the length of the productive life of each bluegrass field.
 
 
 3
 Safe Air is a non-profit corporation formed by individuals from northern Idaho, Washington, and Montana. One of Safe Air's objectives is to stop the practice of open burning. Safe Air asserts that smoke resulting from open burning endangers the public because it contains high concentrations of pollutants that create severe respiratory problems for residents in areas immediately surrounding bluegrass farms. Defendants-Appellees ("the Growers") are a group of 75 individuals and corporations that plant and harvest Kentucky bluegrass seed commercially in Idaho. All of the Growers engage in open burning in the process of growing Kentucky bluegrass.
 
 
 4
 Safe Air filed a complaint in the United States District Court for the District of Idaho on May 31, 2002, alleging that the Growers, by engaging in open burning, violated the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B).[1] Safe Air also sought a preliminary injunction enjoining the Growers from engaging in open burning. The Growers filed a response in opposition to Safe Air's motion for preliminary injunction, and also filed a motion to dismiss the complaint on the basis of lack of subject matter jurisdiction.
 
 
 5
 On July 10-12, 2002, the district court held an evidentiary hearing on Safe Air's request for preliminary injunction at which the testimony of twenty-three witnesses was given subject to cross examination. On July 19, 2002, the district court dismissed Safe Air's complaint, concluding that it was without jurisdiction to resolve Safe Air's RCRA claim because, inter alia, grass residue did not constitute "solid waste" under RCRA.[2]
 
 
 6
 Safe Air appeals. We have jurisdiction under 28 U.S.C. § 1291, and affirm.
 
 II
 
 7
 We first address the unusual procedural posture of the case. The Growers filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12. The district court construed the Growers' motion to dismiss as proceeding under Rules 12(b)(1) and 12(b)(6), and granted the Growers' motion under Rule 12(b)(1).
 
 
 8
 Safe Air argues that the district court erred in dismissing its complaint because: (1) the district court reviewed evidence outside the complaint (i.e., evidence from the preliminary injunction hearing) without converting the motion to dismiss into a summary judgment motion under Rule 56; and (2) the district court erroneously construed as a jurisdictional issue the question of whether grass residue (i.e., the straw and stubble that remain on the Growers' fields after the bluegrass harvest) is "solid waste" under RCRA. We disagree with Safe Air on the first issue because the district court, in this context, was not obligated formally to convert the Growers' motion into a motion for summary judgment solely because it reviewed evidence outside the complaint. However, as to the second issue, we agree that, in the circumstances of this case, the district court erred by treating the issue of whether grass residue is solid waste under RCRA as a jurisdictional issue.
 
 
 9
 The district court dismissed Safe Air's claim for lack of subject matter jurisdiction under Rule 12(b)(1). A Rule 12(b)(1) jurisdictional attack may be facial or factual. White v. Lee, 227 F.3d 1214, 1242 (9th Cir.2000) (citation omitted). In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction. The Growers' jurisdictional attack was factual because the Growers challenged Safe Air's contention that grass residue constitutes solid waste under RCRA. Morrison v. Amway Corp., 323 F.3d 920, 924 n. 5 (11th Cir.2003) (jurisdictional challenge was a factual attack where it "relied on extrinsic evidence and did not assert lack of subject matter jurisdiction solely on the basis of the pleadings").
 
 
 10
 In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. Savage v. Glendale Union High Sch., 343 F.3d 1036, 1039 n. 2 (9th Cir.2003) (citing White, 227 F.3d at 1242). The court need not presume the truthfulness of the plaintiff's allegations. White, 227 F.3d at 1242. "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." Savage, 343 F.3d at 1039 n. 2.
 
 
 11
 However, "[j]urisdictional dismissals in cases premised on federal-question jurisdiction are exceptional, and must satisfy the requirements specified in Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946)." Sun Valley Gas., Inc. v. Ernst Enters., 711 F.2d 138, 140 (9th Cir.1983). In Bell, the Supreme Court determined that jurisdictional dismissals are warranted "where the alleged claim under the constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such claim is wholly insubstantial and frivolous." 327 U.S. at 682-83, 66 S.Ct. 773.
 
 
 12
 We have held that a "[j]urisdictional finding of genuinely disputed facts is inappropriate when `the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits' of an action." Sun Valley, 711 F.2d at 139 (quoting Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir.1983)).[3] The question of jurisdiction and the merits of an action are intertwined where "a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." Id. See also Thornhill Publ'g Co. v. Gen. Tel. Co., 594 F.2d 730, 734 (9th Cir.1979) ("[W]hen a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiffs' substantive claim for relief, a motion to dismiss for lack of subject matter jurisdiction rather than for failure to state a claim is proper only when the allegations of the complaint are frivolous.") (quotation omitted).
 
 
 13
 The district court erred in characterizing its dismissal of Safe Air's complaint under Rule 12(b)(1) because the jurisdictional issue and substantive issues in this case are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits. The Growers have not argued that Safe Air's federal claims are "immaterial," "made solely for the purpose of obtaining federal jurisdiction," or "wholly insubstantial and frivolous." Bell, 327 U.S. at 682-83, 66 S.Ct. 773. Whether Safe Air alleged a claim that comes within RCRA's reach goes to the merits of Safe Air's action. Sun Valley, 711 F.2d at 140 ("[t]he ability of [the plaintiff] to allege a claim that comes within the definitional reach of the [Petroleum Marketing Practices Act] is a matter that goes to the merits of the action.").
 
 
 14
 Safe Air filed its claim under the "citizen suit" provision of RCRA, 42 U.S.C. § 6972(a)(1)(B), which permits suits:
 
 
 15
 against any person ... who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.
 
 
 16
 (emphasis added). Because this provision of RCRA "provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief," the question of jurisdiction and the merits of this action are intertwined. For this reason, we hold that the district court's characterization of its dismissal under Rule 12(b)(1) was error. Sun Valley, 711 F.2d at 139.
 
 III
 
 17
 For the reasons expressed above, we review the district court's order below not as a dismissal for lack of subject matter jurisdiction but rather as a grant of summary judgment on the merits for the Growers. Great W. Bank & Trust v. Kotz, 532 F.2d 1252, 1254 (9th Cir.1976) (per curiam) (reviewing the district court's dismissal for lack of jurisdiction as a grant of summary judgment where the district court's dismissal was based on its conclusion that the note in question was not a "security" within the Securities Exchange Act).[4] Thus we review RCRA and its definition of "solid waste," interpretations of the statutory language in case law, and RCRA's legislative history to determine if Safe Air has demonstrated a genuine issue of material fact on the issue of whether grass residue is "solid waste" under RCRA.
 
 
 18
 "RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." Meghrig v. KFC Western, Inc., 516 U.S. 479, 483, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). "Congress' `overriding concern' in enacting RCRA was to establish the framework for a national system to insure the safe management of hazardous waste." Am. Mining Cong. v. U.S. EPA, 824 F.2d 1177, 1179 (D.C.Cir.1987). Congress also expressed concern over "the `rising tide' in scrap, discarded, and waste materials" and "the need to reduce the amount of waste and unsalvageable materials and to provide for proper and economical solid waste disposal practices." Id. (quoting 42 U.S.C. § 6901(a)(2) and (a)(4)).
 
 
 19
 Safe Air filed this lawsuit under the citizen suit provision of RCRA, 42 U.S.C. § 6972(a)(1)(B). To prevail, Safe Air must establish that the Growers are contributing to the "handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B) (emphasis added). Safe Air does not allege that the grass residue in question is "hazardous waste." Therefore, the crux of the case turns on the issue of whether Kentucky bluegrass residue is "solid waste" within the meaning of RCRA.
 
 
 20
 Faced with the duty to interpret this provision of RCRA, we follow established principles of statutory construction. "[C]anons of statutory construction help give meaning to a statute's words. We begin with the language of the statute." The Wilderness Soc'y v. United States Fish & Wildlife Serv., 353 F.3d 1051, 1060 (9th Cir.2003) (en banc) (internal citations omitted). "[A]nother fundamental canon of construction provides that unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Id. (internal quotation marks omitted). We have also recently reiterated the principle that, "in construing a statute, courts generally give words not defined in a statute their `ordinary or natural meaning.'" Bonnichsen v. United States, 367 F.3d 864, 875 (9th Cir.2004) (quoting United States v. Alvarez-Sanchez, 511 U.S. 350, 357, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994)). With these maxims in mind, we turn again to RCRA.
 
 
 21
 RCRA defines "solid waste" as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations...." 42 U.S.C. § 6903(27) (emphasis added). RCRA itself does not define the term "discarded material." However, we note that the verb "discard" is defined by dictionary and usage as to "cast aside; reject; abandon; give up." 1 The New Shorter Oxford English Dictionary 684 (4th ed.1993). We consider the term "discard" in its ordinary meaning to decide whether Safe Air presented a genuine issue of material fact supporting its contention that the Kentucky bluegrass residue burnt by the Growers is "solid waste" under RCRA.
 
 
 22
 Our sister circuits have considered the scope of RCRA's definition of "solid waste," and their determinations are helpful to our analysis. The D.C. Circuit assessed the scope of RCRA's definition of "solid waste" in American Mining Congress v. U.S. EPA, 824 F.2d 1177 (D.C.Cir.1987) (AMC I). In AMC I, an industry group of mining and oil refining companies challenged an Environmental Protection Agency ("EPA") rule amendment giving the EPA authority to regulate reused materials in the petroleum and mining industries. Noting that "EPA's jurisdiction is limited to those materials that constitute `solid waste,'" AMC I, 824 F.2d at 1179, the D.C. Circuit held that "our analysis of [RCRA] reveals clear Congressional intent to extend EPA's authority only to materials that are truly discarded, disposed of, thrown away, or abandoned." Id. at 1190. It reasoned, persuasively to us, that "[e]ncompassing materials retained for immediate reuse within the scope of `discarded material' strains ... the everyday usage of that term."[5] Id. at 1184. Significant for our purposes, AMC I determined that materials have not contributed to a waste disposal problem where "they are destined for beneficial reuse or recycling in a continuous process by the generating industry itself." Id. at 1186. The D.C. Circuit held that EPA contravened Congress's intent by attempting to regulate "in-process secondary materials." Id. at 1193.[6]
 
 
 23
 The D.C. Circuit reached a similar conclusion in Association of Battery Recyclers v. U.S. EPA, 208 F.3d 1047 (D.C.Cir.2000). The issue in Battery Recyclers was whether materials generated and reclaimed within the mineral processing industry could be deemed "solid waste" under RCRA, such that it could be regulated by the EPA. The court held that "at least some of the secondary material EPA seeks to regulate as solid waste is destined for reuse as part of a continuous industrial process and thus is not abandoned or thrown away." Id. at 1056.
 
 
 24
 The Eleventh Circuit addressed a variation of this issue in United States v. ILCO, 996 F.2d 1126 (11th Cir.1993). In ILCO, a lead smelting company ("Interstate Lead") producing ingots from lead plates of recycled automobile batteries challenged EPA's regulation of the plates.[7] Interstate Lead argued that, because it had never disposed of the lead plates, EPA could not regulate the lead plates as "discarded material" under 42 U.S.C. § 6903(27). The Eleventh Circuit disagreed, reasoning:
 
 
 25
 The lead plates and groups are, no doubt, valuable feedstock for a smelting process. Nevertheless, EPA, with congressional authority, promulgated regulations that classify these materials as `discarded solid waste.' Somebody has discarded the battery in which these components are found. This fact does not change just because a reclaimer has purchased or finds value in the components.
 
 Id. at 1131.[8]
 
 26
 Considering these extra-circuit cases to be persuasive in identifying relevant considerations bearing on whether grass residue is "solid waste" under RCRA, we will also evaluate: (1) whether the material is "destined for beneficial reuse or recycling in a continuous process by the generating industry itself," AMC I, 824 F.2d at 1186; (2) whether the materials are being actively reused, or whether they merely have the potential of being reused, AMC II, 907 F.2d at 1186; (3) whether the materials are being reused by its original owner, as opposed to use by a salvager or reclaimer, ILCO, 996 F.2d at 1131.
 
 
 27
 We turn to the evidence submitted by the parties to the district court. The Growers presented evidence that they do not discard the grass residue, but rather reuse grass residue in a continuous process of growing Kentucky bluegrass. This reuse generates two primary benefits to the Growers: returning nutrients to bluegrass fields and facilitating the open burning process.
 
 
 28
 The Growers presented evidence at the preliminary injunction hearing showing that grass residue contains nutrients that are beneficial to bluegrass fields when returned to soil. Dr. Glen Murray, the Growers' expert on growing Kentucky blue-grass in the northern Idaho area, testified that grass residue contributes recycled nutrients and can act as a fertilizer to bluegrass fields. Karl Felgenhauer, a Washington bluegrass farmer, also testified that grass residue contains such nutrients. Paul Stearns, another Washington bluegrass farmer, testified that grass residue remaining after a bluegrass harvest contains potash and can act as a fertilizer.
 
 
 29
 The Growers also presented evidence that grass residue is an integral component in the open burning process because grass residue carries fire efficiently across bluegrass fields. The grass residue's vital role in the open burning process is significant because the Growers submitted evidence establishing that open burning has four critical benefits for Kentucky bluegrass farmers.
 
 
 30
 First, several witnesses testified that open burning extends the productive life of bluegrass fields. Donald Jacklin, Safe Air's witness, testified that open burning in some cases increases the life of bluegrass fields up to twenty years. Asked about the value of open burning to bluegrass production, Jacklin testified that "nothing equals burning," and that open burning is an agricultural practice incorporated into the production, planting, and harvesting of bluegrass. Dr. Murray testified that a bluegrass field's seed production can be maintained longer with open burning. Felgenhauer, the Washington farmer, testified that he experienced a significant decrease in the life of his bluegrass fields after an open burning ban was instituted in Washington state.
 
 
 31
 Second, several witnesses testified that open burning restores beneficial minerals and fertilizers to bluegrass fields. Dr. Paul Meints, one of Safe Air's experts, testified that the value of burnt grass residue ash to bluegrass fields is "[p]rimarily the restoration of the phosphorus and potassium that is held within that tissue," and that burnt grass residue ash left on soil is beneficial to bluegrass fields because it provides nutrients. Defendant Wayne Meyer, an Idaho bluegrass farmer, testified that phosphorus and potash remain on bluegrass fields as a result of the burning process, and that these elements act as a fertilizer to the fields. Stearns testified that farmers who engage in open burning need to purchase less supplemental potash because open burning releases potash onto the bluegrass field. Dr. Murray testified that nutrients are left in the ash of burnt residue.
 
 
 32
 Third, the Growers presented evidence suggesting that open field burning reduces or eliminates insects on bluegrass fields, reducing the need for pesticide use.[9] Schultheis testified that he had to use more pesticides, herbicides, and fungicides on his fields after he stopped open burning, and that open burning also reduces wheat infestation.[10] Meyer also testified that open burning controls weeds, insects, and disease.
 
 
 33
 Finally, Paul Stearns testified that open burning blackens the soil on bluegrass fields, which maximizes the soil's sunlight absorption to increase the crop yield for the following crop. Dr. Meints also testified that blackened soil absorbs heat and sun rays.
 
 
 34
 Safe Air does not contest that grass residue provides benefits for the Growers, but argues that the primary benefit to the Growers from open burning is removal of grass residue, and that other benefits of grass residue are incidental to the Growers' goal of removing the residue. Safe Air argues that the two most important benefits from open burning of grass residue, sunlight absorption and enhancing productive life of bluegrass fields, result from the removal of grass residue.[11] As to the other benefits (i.e., the fertilizer in the ash and reduced pesticide use), Safe Air argues that these are "incidental benefits that do not change the nature of what is transpiring from the discarding of waste."[12]
 
 
 35
 However, even when we view the evidence in the light most favorable to Safe Air, there is no dispute that the Growers realize farming benefits from reusing grass residue in the process of open burning. Safe Air did not present testimony challenging the Growers' contentions that: (1) grass residue offers nutrients to bluegrass fields; (2) burnt grass residue ash resulting from open burning helps fertilize bluegrass fields; (3) open burning reduces the incidence of weed, fungi, and insect infestation in bluegrass fields; and (4) open burning blackens bluegrass fields, which contributes to creating optimal conditions for the next bluegrass harvest. Safe Air dismisses these indisputable benefits as "incidental," but our view is necessarily controlled by RCRA's statutory language suggesting that materials must be "discarded" to be considered solid waste. Because there is undisputed evidence that the Growers reuse the grass residue in a continuous farming process effectively designed to produce Kentucky bluegrass, there is no genuine issue of material fact as to whether grass residue is "discarded material." It is not. The bluegrass residue is not discarded, abandoned, or given up, and it does not qualify as "solid waste" under RCRA, based on its statutory definition of "solid waste" as "discarded material."
 
 
 36
 Moreover, our evaluation of each of the factors noted by our sister circuits in analogous cases, discussed above, supports that grass residue beneficially reused by the Growers in producing Kentucky bluegrass is not "solid waste" under RCRA. The Growers presented uncontroverted evidence establishing that: (1) the grass residue is destined for beneficial reuse in a continuous process of growing and harvesting Kentucky bluegrass seeds, the generating industry, AMC I, 824 F.2d at 1186; (2) the Growers reuse grass residue, inter alia, to provide nutrients and to act as a fire accelerant for open burning, as opposed to being kept in storage for potential reuse, AMC II, 907 F.2d at 1186; and (3) the grass residue is being reused by farmers who are its original owners (the Growers), not by a salvager or reclaimer. ILCO, 996 F.2d at 1131. Under these standards, which we determine to have persuasive application here, there is no genuine issue of material fact as to whether grass residue is "discarded."
 
 
 37
 RCRA's legislative history also reinforces our conclusion that grass residue is not the type of material that Congress intended to proscribe under RCRA. The House Report reveals that RCRA was intended as "a multi-faceted approach toward solving the problems associated with the 3-4 billion tons of discarded materials generated each year, and the problems resulting from the anticipated 8% annual increase in the volume of such waste." H.R.Rep. No. 94-1491, at 2 (1976), reprinted in 1976 U.S.C.C.A.N. 6238, 6239. Congress was concerned with waste products of all types that were contributing to ever-increasing landfills:
 
 
 38
 In addressing this problem, the Committee recognizes that Solid Waste, the traditional term for trash or refuse is inappropriate. The words solid waste are laden with false connotations. They are more narrow in meaning than the Committee's concern. The words discarded materials more accurately reflect the Committee's interest.
 
 
 39
 Not only solid wastes, but also liquid and contained gaseous wastes, semi-solid wastes and sludges are the subjects of this legislation. Waste itself is a misleading word in the context of the committee's activity.... An increase in reclamation and reuse practices is a major objective of the Resource Conservation and Recovery Act.
 
 
 40
 Id. at 2-3, reprinted in 1976 U.S.C.C.A.N. at 6239-41.
 
 
 41
 In enacting RCRA, Congress also declared that agricultural products that could be recycled or reused as fertilizers were not its concern. The same House Report stated, "[m]uch industrial and agricultural waste is reclaimed or put to new use and is therefore not a part of the discarded materials disposal problem the committee addresses.... Agricultural wastes which are returned to the soil as fertilizers or soil conditioners are not considered discarded materials in the sense of this legislation." Id. at 3, reprinted in 1976 U.S.C.C.A.N. at 6239-41.
 
 
 42
 The burning of bluegrass residue by farmers is not the evil against which Congress took aim. To the contrary, the bluegrass residue is the type of agricultural remnant, used by farmers to add nutrients to soil, that Congress did not consider to be "discarded." H.R.Rep. No. 94-1491, at 3 (1976), reprinted in 1976 U.S.C.C.A.N. at 6239-41 ("[m]uch industrial and agricultural waste is reclaimed or put to new use and is therefore not a part of the discarded materials disposal problem the committee addresses.... Agricultural wastes which are returned to the soil as fertilizers or soil conditions are not considered discarded materials in the sense of this legislation.").
 
 
 43
 Safe Air's response to RCRA's legislative history is unpersuasive. Safe Air argues that because the House Report states that "much industrial and agricultural waste is reclaimed," "much" does not mean "all," and this leaves open the possibility that grass residue is solid waste. However, the possibility of such a distinction in theory does not persuade us that there is a genuine issue of material fact as to whether blue-grass residue can properly be considered "solid waste" within RCRA's meaning.[13]
 
 
 44
 Given the uncontroverted evidence that the Growers reuse the grass residue in a continuous process for Kentucky bluegrass production, and do so in accord with farming practices that are beneficial in increasing crop yields, Safe Air has not demonstrated a genuine issue of material fact on the issue whether grass residue is a "solid waste" under RCRA.[14]
 
 
 45
 We discern from Congress's explicit language in RCRA, focusing on discarded materials as a touchstone for solid waste, and from Congress's stated purposes, no Congressional declaration or intent to prohibit the established farming practice of open burning of Kentucky bluegrass residue. The benefits to the Growers of this practice were established beyond dispute in the evidence presented to the district court. Safe Air has not demonstrated that there is a genuine issue of material fact as to whether grass residue is "solid waste" under RCRA.[15] On the undisputed evidence, we conclude that Kentucky bluegrass residue is not a "solid waste," and that RCRA does not prohibit the Growers' general practice of open burning.[16]
 
 
 46
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 This provision permits an individual to file suit:
 against ... any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.
 42 U.S.C. § 6972(a)(1)(B).
 
 
 [2]
 The district court also dismissed Safe Air's federal common law nuisance claim. That claim is not presented to us on appeal
 
 
 [3]
 Two of our sister circuits that have considered this issue are in accordSee, e.g., Morrison v. Amway Corp., 323 F.3d 920, 925 (11th Cir.2003) ("[w]e have cautioned, however, that the district court should only rely on Rule 12(b)(1) if the facts necessary to sustain jurisdiction do not implicate the merits of plaintiff's cause of action.") (internal quotation omitted); Williamson v. Tucker, 645 F.2d 404, 415 (5th Cir.1981) ("Where the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court ... is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case.").
 
 
 [4]
 Viewed in this light, we will review the ruling de novoUnited States v. City of Tacoma, 332 F.3d 574, 578 (9th Cir.2003). Viewing the evidence in the light most favorable to the nonmoving party, we determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Navajo Nation v. Norris, 331 F.3d 1041, 1044 (9th Cir.2003). We do not weigh the evidence or determine the truth of the matter, but only determine whether a genuine issue of material fact exists for trial. Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir.1999) (en banc).
 
 
 [5]
 The Second Circuit took a consistent approach, though reaching a different result on the facts, inConnecticut Coastal Fishermen's Assoc. v. Remington Arms Co., 989 F.2d 1305 (2d Cir.1993). In Connecticut Coastal, the materials at issue were 2400 tons of lead shot and eleven million pounds of clay target fragments located on land and waters surrounding a shooting club. The materials had accumulated after seventy years of operation of the shooting club. The court held, "[w]ithout deciding how long materials must accumulate before they become discarded ... we agree that the lead shot and clay targets in Long Island Sound have accumulated long enough to be considered solid waste." Id. at 1316 (emphasis added). Thus, the length of time the materials accumulated was important to determining whether the materials were solid waste.
 
 
 [6]
 The D.C. Circuit revisited this issue inAmerican Mining Cong. v. U.S. EPA, 907 F.2d 1179 (D.C.Cir.1990) (AMC II), when it held that sludge from wastewater that may at some time in the future be reclaimed constitutes "discarded" material under RCRA. Id. at 1186-87. The court determined that "[n]othing in [AMC I] prevents [EPA] from treating as `discarded' the wastes at issue in this case, which are managed in land disposal units that are part of wastewater treatment systems, which have therefore become `part of the waste disposal problem,' and which are not part of ongoing industrial processes." Id. at 1186.
 
 
 [7]
 EPA regulated these materials under RCRA's "hazardous waste" subsection; however, as we have already discussed, hazardous waste under RCRA is a subset of "solid waste," and the definition of "solid waste" at issue inILCO was the same as that before us.
 
 
 [8]
 We recognize that the issue of monetary value does not affect the analysis of whether materials are "solid waste" under RCRA. As the Eleventh Circuit held inILCO, the fact that discarded materials are "solid waste" under RCRA does not change "just because a reclaimer has purchased or finds value in the components." Interstate Lead, 996 F.2d at 1131. However, in this case the Growers do not base their argument on the assertion that grass residue has monetary value to someone; rather, the Growers argue that grass residue is not solid waste because they immediately reuse it to further successful bluegrass harvests.
 
 
 [9]
 The Idaho legislature has made a similar finding that "the current knowledge and technology support the practice of burning crop residue to control disease, weeds, pests, and to enhance crop rotations." Idaho Code § 22-4801
 
 
 [10]
 Wheat infestation tends to reduce the quality of a bluegrass harvest
 
 
 [11]
 Safe Air, for example, presented testimony of Jacklin, a bluegrass farmer, that "99.9%" of the reason why he engaged in burning was for the "photo induction enhancement" of seed yield, which he characterized as maximizing the sunlight exposure of new bluegrass plant tissue
 
 
 [12]
 For example, Dr. Meints testified that open burning does not "necessarily" reduce the need for use of pesticides, herbicides, and fungicides, although he conceded that he did not submit evidence in the record to support that conclusion. Dr. Meints also testified that much organic matter is burned during the open burning process, and that any organic matter that remains after open burning provides little benefit to soil
 
 
 [13]
 Referring to the House Report's comment that "[a]gricultural wastes which are returned to the soil as fertilizers or soil conditions are not considered discarded materials in the sense of this legislation," Safe Air argues that "[i]f the Growers mulched their residue and returned it to the soil, this sentence might have applicability. But that is not what they do. They burn the residue...." This argument has some weight but is not dispositive. It is true that a part of the residue is returned to soil while a part that is smoke is carried off by air. Yet, for materials to be solid waste under RCRA, they must be "discarded." The determination of whether grass residue has been "discarded" is made independently ofhow the materials are handled. Despite the fact that a portion of residue becomes airborne smoke, the residue is not thereby automatically "discarded."
 
 
 [14]
 The dissent makes four arguments to which we respond briefly
 First, the dissent argues that grass residue is "discarded material" under a dictionary definition and maintains that is dispositive. In our textual discussion we noted the dictionary meaning of "discard" as "cast aside; reject; abandon; give up," and we have fairly applied this definition. As we explain in our analysis, we conclude that grass residue is not "solid waste" under RCRA. Thus, while both this opinion and the dissent agree that we start with the statute's language, in our view the dissent goes astray with an incomplete analysis.
 Second, the dissent contends that the out-of-circuit cases that we cite are inapplicable because they involve EPA regulations that have a narrower definition of "solid waste." This argument is without merit. Because these cases involve challenges to EPA's regulation of particular items, these cases necessarily address whether those items were within RCRA's statutory definition of "solid waste" as "discarded material," the same definition at issue here. ILCO, 996 F.2d at 1132 (rejecting challenge to EPA regulation because batteries were "discarded" under RCRA's general definition of "solid waste"); AMC I, 824 F.2d at 1185 ("The question we face ... is whether... Congress was using the term `discarded' in its ordinary sense...."); AMC II, 907 F.2d at 1186 ("Nothing in AMC prevents [EPA] from treating as `discarded' the wastes at issue in this case...."). These cases analyze the term "discarded," are persuasively contrary to the dissent's analysis, and are relevant to the issue before us which has never been decided by our circuit.
 Third, the dissent argues that our holding permits any disposal process as long as the waste residue is eventually returned to soil. This is an incorrect overstatement. We only hold that, in these circumstances of Kentucky bluegrass farming, grass residue customarily used in the farming cycle is not "solid waste" under RCRA.
 Finally, the dissent urges that a genuine issue of material fact exists as to the value of grass residue to the Growers. But as we explain in our textual discussion, the Growers introduced uncontested testimony, during an extensive evidentiary hearing in the district court, that grass residue has benefits to the Growers. The dissent does not point to any testimony contradicting this point that the district court found uncontested. It is not enough for Safe Air merely to argue that the uncontested benefits are ancillary.
 
 
 [15]
 Having determined that grass residue is not "solid waste" under RCRA, we need not address whether the Growers' handling of the grass residue constitutes a "disposal," "treatment," or "handling" of solid waste. Nor do we address whether the Growers' practice of open burning constitutes an "imminent and substantial endangerment" under RCRA
 
 
 [16]
 Of course, any burning of bluegrass residue must comply with both the federal Clean Air Act, 42 U.S.C. § 7470 et seq., and with any applicable state regulation. As pertinent here, the lawsuit before us on appeal makes no claim under the Clean Air Act, and the record, so far as it addresses this issue, suggests that the Growers have complied with air quality standards set by federal and state regulators charged with enforcement of the Clean Air Act. In addition, Idaho has not outlawed generally the practice of burning Kentucky bluegrass residue, and the Growers' conduct is not alleged to violate Idaho state regulation of open burning as it affects air qualitySee generally Idaho Code § 22-4801 (Michie 1995 & Supp.2002).
 
 
 
 47
 PAEZ, Circuit Judge, concurring in part, dissenting in part:
 
 
 48
 I concur in Part II of the majority opinion, in which the majority concluded that we should review the district court's dismissal for lack of jurisdiction as a grant of summary judgment on the merits for the Growers. I respectfully dissent, however, from Part III, which holds that Safe Air has not demonstrated that the post-harvest crop residue is a "solid waste" under RCRA. Because I disagree with the legal standard that the majority applies to determine whether the post-harvest crop residue has been "discarded," I would conclude instead that the Growers have discarded the post-harvest crop residue within the meaning of RCRA. Even if I were to agree with the majority's interpretation of the RCRA statute, I would nonetheless hold that there are genuine triable issues of fact. Accordingly, I would reverse the district court's judgment and remand for trial.
 
 I.
 
 49
 Because RCRA does not define "discarded" we look to the "ordinary, contemporary, common meaning" of that term.[1] Wilderness Soc'y v. United States Fish & Wildlife Serv., 353 F.3d 1051, 1060 (9th Cir.2003) (en banc) (internal quotation marks omitted). Thus, our ultimate task is to determine whether Safe Air has presented evidence that, if accepted as true, creates a genuine issue concerning whether the Growers have "drop [ped], dismiss[ed], let go, or g[o]t rid of as no longer useful, valuable or pleasurable" the post-harvest crop residue. Webster's Third New International Dictionary 644 (1993).
 
 
 50
 Considering the evidence presented to the district court, I have little difficulty concluding that Safe Air has presented sufficient evidence to show that the post-harvest crop residue was "discarded." In opposition to the Growers' motion to dismiss and in support of its motion for preliminary injunction, Safe Air presented the district court with testimony and affidavits from its members, individuals in the community and medical and agricultural experts. In this testimonial and documentary evidence, Safe Air established that it is necessary to remove the post-harvest residue in order to maintain seed yields. Indeed, Safe Air contended that "the primary purpose of burning the fields is to remove the excess post-harvest crop residue from the bluegrass fields."
 
 
 51
 In their motion to dismiss, the Growers did not dispute Safe Air's assertion that the post-harvest crop residue had to be removed from the fields. Although the Growers presented testimony and affidavits contending that they did not intend to discard the residue, they nonetheless admitted that the residue had to be removed from the fields in order to maintain seed production and to limit the insects and parasites that would otherwise find food and shelter in the residue.[2]
 
 
 52
 Because there is no dispute that the Growers burn the post-harvest crop residue to remove it from the fields, and because this act of removal is within the plain meaning of "discard," I would reverse the district court's judgment and remand for further proceedings.[3]
 
 II.
 
 53
 It is well-established that "[w]here the plain meaning of a provision is unambiguous that meaning is controlling, except in the rare case [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of the drafters." Coronado-Durazo v. INS, 123 F.3d 1322, 1324 (9th Cir.1997) (internal quotation marks omitted). See also United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) ("If the statutory language is unambiguous, in the absence of `a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'") (quoting Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)). The majority's analysis, however, extends beyond the plain meaning of "discard" to evaluate those "relevant considerations," Maj. Op. at 1043, that it has gleaned from extra-circuit cases discussing the meaning of "discard" in distinctly different contexts. Because I do not believe that there is any need to look beyond the ordinary meaning of the term "discard" and the majority has not offered any convincing rationale for its extended analysis, I would only look to the ordinary meaning of "discard," and would conclude, as explained above, that the Growers discard the post-harvest crop residue.
 
 
 54
 Even if the majority could justify importing "relevant considerations" in determining the meaning of "discard," I would nonetheless reverse the district court's judgment in this case. I disagree that the extra-circuit cases — or indeed, the statute itself — support the majority's conclusion that mere beneficial reuse means that a substance has not been discarded under RCRA. Moreover, even were I to accept the majority's interpretation, I would conclude that a genuine issue of material fact exists as to whether the post-harvest crop residue is "destined for beneficial reuse in a continual process." Maj. Op. at 1045.
 
 A.
 
 55
 The majority cites to RCRA's legislative history to support its conclusion that RCRA does not encompass the post-harvest residue at issue here. Because the plain and unambiguous definition of "discard" encompasses the post-harvest crop residue, the legislative history should be examined only to determine whether there is a "clearly expressed ... contrary legislative intent." United States v. Fiorillo, 186 F.3d 1136, 1146 (9th Cir.1999) (quotation marks omitted) (analyzing statutory provision of RCRA).
 
 
 56
 Far from revealing a "contrary" intent, the legislative history demonstrates that Congress intended solid waste to include "any ... discarded material resulting from ... agricultural operations...." 42 U.S.C. § 6903(27) (emphasis added).[4] The House Report indicates that Congress purposefully defined "solid waste" to include "discarded materials" to give RCRA a broader reach. See H.R.Rep. No. 94-1491, pt. I, at 2, 9 (1976), reprinted in 1976 U.S.C.C.A.N. 6238, 6240, 6246.[5]
 
 
 57
 The majority makes much of the fact that the House Report excludes "[a]gricultural wastes which are returned to the soil as fertilizers or soil conditioners...." H.R.Rep. No. 94-1491, pt. I, at 2, reprinted in 1976 U.S.C.C.A.N. at 6239; but see 40 C.F.R. § 261.4(b)(2) (indicating that residue from the "growing and harvesting of agricultural crops" which "are returned to the soils as fertilizers" are "[s]olid wastes which are not hazardous wastes."). But this statement does not indicate that Congress intended to exclude from the scope of RCRA agricultural waste that is first burned before being used as fertilizer.[6] According to the majority's logic, any disposal process, no matter how environmentally unsound, would be exempted from the reach of RCRA as long as the waste residue was eventually returned to the soil. This could not have been Congress' intent, especially since Congress expressed a special concern with waste that was burned. See H.R.Rep. No. 94-1491, pt. I, at 37-38, 90, reprinted in 1976 U.S.C.C.A.N. at 6275-77, 6325-26; see also id. at 17-24, reprinted in 1976 U.S.C.C.A.N. at 6254-62 (listing improper disposal practices that resulted in harmful air pollution). Cf. Am. Mining Cong. v. U.S. EPA, 907 F.2d 1179, 1187 (D.C.Cir.1990) (AMC II) (concluding that, where the disposal or treatment process posed a danger to the public health, the material disposed of should be considered "discarded").
 
 
 58
 No statutory declaration or other Congressional statement of intent suggests that post-harvest residue that is burned should be excluded from RCRA's definition of "solid waste." Rather, the House Report reflects that RCRA specifically applies to disposal practices that result in air pollution:
 
 
 59
 The Committee believes that the approach taken by this legislation eliminates the last remaining loop-hole in environmental law, that of unregulated land disposal of discarded materials and hazardous wastes. Further, the Committee believes that this legislation is necessary if other environmental laws are to be both cost and environmentally effective. At present the federal government is spending billions of dollars to remove pollutatns [sic] from the air and water, only to dispose of such pollutants on the land in an environmentally unsound manner. The existing methods of land disposal often result in air pollution, subsurface leachate and surface run-off, which affect air and water quality. This legislation will eliminate this problem and permit the environmental laws to function in a coordinated and effective way.
 
 
 60
 H.R.Rep. No. 94-1491, Part I, at 4 (1976), reprinted in 1976 U.S.C.C.A.N. at 6241-42. Where, as here, the residue is discarded and burned, the legislative history indicates that the disposal of such material is within the meaning of "solid waste" under RCRA.
 
 B.
 
 61
 The majority also relies on extra-circuit cases to support its conclusion that the post-harvest crop residue is not "discarded." These cases, however, are inapplicable to the interpretation of "solid waste" at issue here. Most notably, those cases interpret the meaning of "solid waste" in considering the validity of hazardous waste regulations promulgated by the Environmental Protection Agency ("EPA").[7] See AMC I, 824 F.2d at 1178 (considering whether the EPA exceeded its regulatory authority by including "in process secondary materials" in its definition of solid waste); American Mining Cong. v. U.S. EPA, 907 F.2d 1179, 1181-82 (D.C.Cir.1990) (AMC II) (considering whether the EPA exceeded its regulatory authority in treating six wastes generated from metal smelting operations as "hazardous" waste); United States v. ILCO, Inc., 996 F.2d 1126, 1130 (11th Cir.1993) (considering whether "lead parts, which have been reclaimed from spent car and truck batteries for recycling purposes, are exempt from[the EPA's] regulation under RCRA").
 
 
 62
 Although RCRA defines "solid waste" to cover all types of "discarded materials," see 42 U.S.C. § 6903(27), the EPA's RCRA regulations at issue in AMC I, AMC II and ILCO have a special definition of "solid waste," see 40 C.F.R. § 261.2(a)(1), which "applies only to wastes that also are hazardous for purposes of the regulations implementing Subtitle C of RCRA." 40 C.F.R. § 261.1(b)(1).[8] Thus, the regulatory definition considered in AMC I, AMC II and ILCO is significantly narrower than the statutory definition at issue here. Accordingly, I do not find these cases persuasive in our determination of whether the post-harvest crop residue has been "discarded."
 
 C.
 
 63
 Even if I were to agree with the majority's conclusion that the extra-circuit cases constitute persuasive authority, Maj. Op. at 1043, I would nonetheless conclude that there is a genuine factual dispute as to whether the post-harvest crop residue has been discarded. I would therefore reverse the summary judgment in favor of the Growers.
 
 
 64
 Relying on the analysis in AMC I, AMC II and ILCO, the majority reasons that as long as the residue "provides benefits for the Growers," Maj. Op. at 1044, it has not been "discarded" under RCRA. This unnecessarily narrows the definition of "discarded material."
 
 
 65
 The cases do not support the majority's proposition that the mere recognition of some beneficial use negates the fact that materials have been "discarded" under RCRA. The cases cited by the majority distinguish between those materials extracted and immediately reused in an ongoing process and those materials discarded and only later put to beneficial use. AMC I merely held that materials extracted from primary metals that are recaptured and recycled as part of an ongoing industrial process are not "solid waste" under the EPA's regulatory definition of that term. That same court later clarified that AMC I's "holding concerned only materials that are `destined for immediate reuse in another phase of the industry's ongoing production process....'" AMC II, 907 F.2d at 1186 (quoting AMC I, 824 F.2d at 1185) (emphasis in original). The D.C. Circuit also rejected the claim that "potential reuse of a material prevents the [EPA] from classifying it as `discarded.'" Id.; see also ILCO, 996 F.2d at 1132 (noting that "[p]reviously discarded solid waste, although it may at some point be recycled, nonetheless remains solid waste"); Am. Petroleum Inst. v. U.S. EPA, 906 F.2d 729, 741 (D.C.Cir.1990) (holding that slag residue resulting from the production of steel was "discarded" even though zinc would later be recovered from the slag at a reclamation facility.).
 
 
 66
 Thus, even following the majority's analysis and drawing on the principles from the above cases, it still must be shown that the residue is "destined for immediate reuse in another phase of the industry's ongoing production process." AMC II, 907 F.2d at 1186 (emphasis in original). Relevant considerations may include such questions as the intent of the Growers in using the materials and the purpose of removing the residue, see No Spray Coalition, Inc. v. City of New York, 252 F.3d 148 (2d Cir.2001) (insecticides are not "discarded" within the meaning of RCRA when they are sprayed into the air with the design of effecting their intended purpose of killing mosquitoes and their larvae); Water Keeper Alliance v. United States Dep't of Defense, 152 F.Supp.2d 163, 167-69 (D.P.R.) (holding that ordinances were not "discarded material" under RCRA as soon as they made contact with the land because, at that moment, at least, they were still serving their intended purpose), aff'd 271 F.3d 21 (1st Cir.2001); and the specific mechanics of the process, including, for example, the length of time the post-harvest crop residue was left on the fields before the Growers burned it, see Conn. Coastal Fishermen's Ass'n. v. Remington Arms Co., 989 F.2d 1305, 1316 (2d Cir.1993) (lead and clay shots were discarded because they had been "left to accumulate long after they[had] served their intended purpose").
 
 
 67
 Safe Air contends that the Growers' primary purpose in burning the residue is to remove it — that is, "burning blue-grass residue is primarily an inexpensive waste disposal practice." On the other hand, the Growers argue that they consider the post-harvest crop residue "important and valuable materials used in the agricultural process." There are thus decidedly different accounts of whether and how the post-harvest crop residue factors into the continuing growth process for Kentucky bluegrass.[9] Even if I were to agree with the majority's approach, I would reverse the district court's judgment in favor of the Growers because there exists a genuine dispute as to material facts. See, e.g., United States v. City of Tacoma, 332 F.3d 574, 578 (9th Cir.2003) (noting that summary judgment is not proper if there is a genuine dispute as to any material fact).
 
 III.
 
 68
 Because I would remand for further proceedings, I briefly address the question the majority has not decided: whether the burning of the post-harvest crop residue constitutes "the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment...." 42 U.S.C. § 6972(a)(1)(B).
 
 
 69
 "Disposal" is defined in RCRA to include the "deposit ... or placing of solid waste ... into or on any land ... so that such solid waste ... or any constituent thereof may enter the environment or be emitted into the air...." 42 U.S.C. § 6903(3) (1995). Here, the burning of the post-harvest crop residue clearly results in smoke and emits particles into the air, and such emissions only occur as a result of the Growers' actions — that is, by setting fire to the fields. Thus, I would hold that the burning of the post-harvest crop residue constitutes "disposal" of that waste under RCRA.
 
 
 70
 In the alternative, I also would hold that burning the fields to remove the post-harvest crop residue constitutes "treatment" or "handling" of solid waste under § 6972(a)(1)(B). RCRA does not define "treatment" or "handling" in the context of solid waste, and thus, once again, I look to the ordinary meaning of these terms.[10] See Wilderness Soc'y, 353 F.3d at 1060. The ordinary meaning of "treatment" is "the action or manner of treating;" "treat" is further defined as "to handle, manage, or otherwise deal with ... to subject to some action (as of a chemical reagent) ... to subject (as a natural or manufactured article) to some process to improve the appearance, taste usefulness, or some other quality." Webster's Third New International Dictionary 2434-5 (1993). Thus, even if the Growers burned the waste solely to improve its usefulness — such as converting it into fertilizer — their actions would still constitute "treatment" of that waste.
 
 
 71
 Similarly, the burning of the post-harvest crop residue constitutes "handling" of that waste. The ordinary meaning of "handle" is: "to deal with; act upon; dispose of; perform some function with regard to." Id. at 1027. Again, the Growers' burning of the post-harvest crop residue fits within this definition.
 
 
 72
 The definitions of these terms — "solid waste," "disposal," "treatment," and "handling" — together with the undisputed facts regarding the need to remove the post-harvest crop residue, make it apparent that RCRA applies to the burning of the post-harvest crop residue. Accordingly, I would hold that the Growers' practice of burning the post-harvest crop residue after the bluegrass harvest constitutes "handling" or "treatment" of "solid waste" within the meaning of § 6972(a)(1)(B). For all the reasons above, I would reverse the district court's judgment in favor of the Growers and remand for trial.
 
 
 
 Notes:
 
 
 [1]
 As the majority recognizes, the question of whether the post-harvest crop residue constitutes "solid waste" under RCRA depends on the meaning of "otherwise discarded material." Thus, I primarily focus here on the definition of "discarded material."
 
 
 [2]
 For example, Dr. Murray, an expert testifying on behalf of the Growers, admitted during his testimony at the preliminary injunction hearing that "the primary reason that Kentucky bluegrass farmers use fire is to remove the residue from the field." Similarly, Mr. Jacklin, a bluegrass farmer testifying on behalf of Safe Air, noted that "99.9 percent" of the reason for burning the fields is to remove the post-harvest crop residue to ensure that the light needed for bluegrass seed production could reach the bluegrass plants
 
 
 [3]
 Although there is no dispute that the post-harvest crop residue has been discarded, I would not hold that Safe Air is entitled to summary judgment in its favor because Safe Air must also prove that the Growers' burning constitutes an "imminent and substantial endangerment to the public health." 42 U.S.C. § 7002 et seq. The district court did not address this issue and it should do so in the first instance
 
 
 [4]
 Indeed, where, as here, the statute is a remedial statute, enacted to protect the public health, we are most likely to satisfy Congress's purposes by construing the statute broadlySee e.g., Hanford Downwinders Coalition, Inc. v. Dowdle, 71 F.3d 1469, 1481 (9th Cir.1995) (noting that the Comprehensive Environmental Response, Compensation and Liability Act was enacted to protect public health and, should thus be construed broadly); United States v. Aceto Agr. Chem. Corp., 872 F.2d 1373, 1383 (8th Cir.1989) (recognizing that RCRA is a remedial statute that should be construed liberally).
 
 
 [5]
 When RCRA was enacted, agricultural waste was the second largest source of waste in this country, producing 687 million tons per yearSee H.R.Rep. No. 94-1491, pt. I, at 15, reprinted in 1976 U.S.C.C.A.N. at 6252-53. Congress enacted RCRA to regulate disposal methods, including burning, that created health and safety risks. See id. at 37-38, 90, reprinted in 1976 U.S.C.C.A.N. at 6275-77, 6325-26. Construing "solid waste" to include the post-harvest crop residue at issue here furthers Congress's intent to regulate the disposal of waste that could endanger public health.
 
 
 [6]
 Although the majority states that "the determination of whether [the post-harvest crop] residue has been `discarded' is made independently ofhow the materials are handled," the majority ignores the fact that the question of whether the post-harvest crop residue is "solid waste" is inextricable from the question of how those materials are handled. See 42 U.S.C. § 6903(27). Thus, the fact that the residue is burned, rather than mulched and returned to the soil, is relevant to whether the residue constitutes "solid waste" under RCRA.
 
 
 [7]
 Under RCRA, a "solid" waste is "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material...." 42 U.S.C. § 6903(27). A "hazardous" waste, however, is a subset of "solid" waste which may "(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5)
 
 
 [8]
 Subtitle C of RCRA, 42 U.S.C. §§ 6921-6939, requires the EPA to create a comprehensive regulatory scheme for the treatment, storage and disposal of hazardous wastes. Under this section, the EPA must "develop and promulgate criteria for identifying the characteristics of [those] `solid' wastes that are also `hazardous' wastes." 42 U.S.C. § 6921(a), (b)
 
 
 [9]
 The majority notes that Safe Air does not dispute that the post-harvest crop residue provides some benefits to the Growers. But, under the majority's approach, this is not the question that must be resolved in determining whether the residue has been "discarded." Rather, the key inquiry is whether the Growers reuse the post-harvest crop residue in a continuous process of producing seed. Although the majority states that the Growers produced "uncontroverted evidence that [they] reuse the [post-harvest crop] residue in a continuous process," Maj. Op. at 1046, Safe Air in fact vigorously contested this assertion. For example, Dr. Meints, an expert for Safe Air, submitted a declaration stating that fire isnot necessary to produce bluegrass seed:
 The primary purpose of burning bluegrass straw is to remove the excess post-harvest crop residue from bluegrass fields. Fire is not necessary to physiologically shock or stimulate bluegrass to produce seed or increase seed yield. Fire is an inexpensive way for the [G]rowers to remove post-harvest crop residue from the field and remove grass straw from the crown of the plant.... Farmers in Washington [for example] have successfully grown and harvested bluegrass seed on tens of thousands of acres without open field burning.
 Similarly, Art Krenzel, another expert for Safe Air, submitted a declaration explaining that fire is not necessary to produce bluegrass seed:
 For years, it was an unchallenged tenet in the Kentucky bluegrass industry that fire is necessary to physiologically shock or stimulate the bluegrass plant to produce seed or maintain seed yields. Both [u]niversity and private research in Kentucky bluegrass seed production have soundly proved this concept is incorrect, repeatedly.... Bluegrass farmers use fire to remove the grass straw because it is a cheap way to dispose of unwanted bluegrass crop residue so that the plants will receive sufficient sunlight, moisture, and space to produce a good seed crop the following year.
 
 
 [10]
 RCRA does define "treatment" in the context of 42 U.S.C. § 6928(d)(2)(A), which refers specifically to the "treatment, storage or disposal of" hazardous waste: "The term `treatment'... means any method ... designed to change ... the character or composition of any hazardous waste ... so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage or reduced in volume." 42 U.S.C. § 6903(34)