**OTAY LAND COMPANY, a Delaware limited liability company, et al.,
Plaintiffs,**

v.

**U.E. LIMITED, L.P., a California limited partnership, et al.,
Defendants.**

**No. 03CV2488BEN(POR).**

United States District Court,
S.D. California.

July 18, 2006.

James A. Bruen, Farella Braun and Martel, San Francisco, CA, for Plaintiffs.

Alice A. Seebach, Seebach and Seebach, Deanne L. Miller, Morgan Lewis and Bockius, Los Angeles, CA, Mark J. Dillon, Gatzke Dillon and Ballance, Carlsbad, CA, R. Anthony Mahavier, Law Offices of R. Anthony Mahavier, John Joseph Freni, Law Offices of John J. Freni, San Diego, CA, Walter B. Hill, Jr., Booth Mitchel and Strange, Orange, CA, for Defendants.

Thomas L. Van Wyngarden, Deanne L. Miller, Morgan Lewis and Bockius, Los Angeles, CA, for Olin Corporation.

## ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS ON FEDERAL CLAIMS AND DECLINING TO RETAIN JURISDICTION OVER STATE LAW CLAIMS

BENITEZ, District Judge.

### I. INTRODUCTION

When a gun enthusiast takes target practice at a public trap and skeet range

and lead shot falls back down to earth, does the firing range become a hazardous waste "facility" as defined by the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), or does it come within the safe harbor provision created for consumer products in consumer use. In this case of first impression, the Court holds that a shooting range site used by the public for sport or recreation, where spent ammunition or targets have come to be deposited as a byproduct of target practice, is not a hazardous waste "facility" subject to CERCLA. It is not a case about whether former ranges should be remediated; it is a question of who should bear the cost.

On October 13, 1998, Plaintiff Otay Land Company was formed by two large investors for the purpose of bidding on a 4,793 acre piece of real estate at an estate sale.[1] On October 15, 1998, Otay Land Company successfully outbid other bidders with a bid of $19.5 million.[2] Prior to the bidding and sale, Otay Land Company was advised by its own consultant that a trap and skeet range had formerly operated on part of the tract.[3] Not surprisingly, after the purchase in 1998, Otay Land Company found lead shot and clay targets on the ground. In December 2003, Otay Land Company transferred ownership of 69 acres which includes the shooting range site to Plaintiff Flat Rock Land Company, LLC. Otay Land company is the sole owner of Flat Rock Land Company.

In December 2003, Plaintiffs brought this action against former owners and operators of the firing range under § 107(a) of CERCLA, § 7002 of the Resource Conservation and Recovery Act ("RCRA"), and other state laws[4] seeking declaratory and injunctive relief and money damages to pay for the cost of investigating, remediating or restoring the soil from the former trap and skeet shooting range. Neither the United States Environmental Protection Agency nor any state or local governmental agency has ordered Plaintiffs to clean up the site. And there is no evidence that the site could not continue to be used as a shooting range in the future. Defendants now move for summary judgment. For the reasons that follow, this Court grants summary judgment in favor of Defendants on the CERCLA claim and the RCRA claim, and declines to exercise

---

**1.** Deposition of Paul Borden, ed as Q to Declaration of Asa S. Hami in Support of Motion of Olin Corporation for Summary Judgment (filed Feb. 24, 2006) (Otay Land Company was formed and capitalized on October 13, 1998 by Home Fed Corporation and Leucadia National Corporation).

**2.** Declaration of Paul Borden in Support of Plaintiffs' Oppositions to Motions for summary Judgment (signed March 7, 2006).

**3.** October 14, 1998 Report of GeoRemediation, Inc. (addressed to Home Fed Corp.), Exhibit 32, attached to Declaration of Derrick K. Watson in Support of Plaintiffs' Oppositions to Motions for Summary Judgment (filed March 13, 2006) ("A facility which has apparently been historically used for the discharge of firearms was noted to exist along the western border of Parcel A. Although this should not be viewed as a major environmen-

tal concern, the artificial presence of lead is very likely to exist in relatively shallow soil deposits at and adjacent to this facility.").

**4.** Plaintiffs also seek relief under California's Hazardous Substances Account Act ("HSAA"), Cal. Health & Safety Code §§ 25300 et seq. (the second claim for relief), damages for a continuing nuisance (the fourth claim for relief), damages for a continuing trespass (the fifth claim for relief), equitable indemnity (the sixth claim for relief), restitution for unjust enrichment (the seventh claim for relief), costs, restitution and injunctive relief for violations of California's unfair business practices act, Cal. Bus. & Professions Code § 17200 et seq. (the eighth claim for relief), and declaratory relief (the ninth claim for relief).

ancillary jurisdiction over the pendant state law claims.

## II. FACTS

Plaintiffs are the current owners of property located at 5350 Heritage Road, Chula Vista, California ("the shooting range"). The property is a former trap and skeet shooting range which opened to the public in 1965, and operated at various times between 1965 and 1998. Defendants are allegedly former owners of the property or operators of the shooting range.

## III. LEGAL STANDARD

### A. *SUMMARY JUDGMENT*

Federal Rule of Civil Procedure 56(c) permits a court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325–327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is warranted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The movant has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The movant is not required to produce evidence showing the absence of a genuine issue of material fact, nor is he or she required to offer evidence totally negating the non-movant's claims. *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 885, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.1989). If the movant meets his or her burden, the burden then shifts to the non-movant to show that summary judgment is not appropriate. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The non-movant does not meet this burden by showing "some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A mere scintilla of evidence in support of the non-moving party's position is not sufficient, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Accordingly, the non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials in his [or her] pleadings." *Id.* at 256, 106 S.Ct. 2505. The non-movant must go beyond the pleadings to designate specific facts showing that there are genuine factual issues that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. If the non-movant fails to make a sufficient showing of an element of his or her case, the movant is entitled to a judgment as a matter of law. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548.

However, in considering the motion, the non-movant's evidence is to be believed and all justifiable inferences are to be drawn in his or her favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Determinations regarding credibility, the weighing of evidence, and the drawing of legitimate inferences are jury functions, and are not appropriate for resolution by the court on a motion for summary judgment. *Id.*

### B. *CERCLA*

■ Plaintiffs seek to hold Defendants liable for clean-up costs under § 107 of

CERCLA (42 U.S.C. § 9607), which provides an implied right to contribution. *See* Order Granting Plaintiffs' Motion to Amend the Second Amended Complaint (filed Sept. 22, 2005) (dkt. no. 112) (relying on *Pinal Creek Group v. Newmont Min. Corp.*, 118 F.3d 1298, 1300 (9th Cir.1997)); *but see Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 125 S.Ct. 577, 584, 160 L.Ed.2d 548 (2004) (declining to address the issue of whether § 107 provides an implied right of contribution).

"CERCLA was a response by Congress to the threat to public health and the environment posed by the widespread use and disposal of hazardous substances.... Its purpose was to ensure the prompt and effective cleanup of waste disposal sites, and to assure that parties responsible for hazardous substances bore the cost of remedying the conditions they created." *Pinal Creek*, 118 F.3d at 1300 (internal citation omitted). "Section 107 of CERCLA permits the government or a private party who has incurred response costs to bring suit against a PRP[5] to recover those costs." *Fireman's Fund Ins. Co. v. City of Lodi, California*, 302 F.3d 928, 945 (9th Cir.2002), *cert. denied*, 538 U.S. 961, 123 S.Ct. 1754, 155 L.Ed.2d 512 (2003); *see also* 42 U.S.C. § 9607.

■■■■ To prove a *prima facie* case, or to escape Defendants' summary judgment on the CERCLA claim, the Plaintiffs must establish at least a genuine issue of material fact concerning the following four elements: (a) the site is a "facility" under § 9601(9); (b) there has been an actual or "threatened release" of a hazardous substance from the "facility"; (c) the release has caused Plaintiffs to incur response costs that are both "necessary" and "consistent with the national contingency plan"; and (d) the Defendants are within one of the four classes of "responsible parties" (or PRPs) described in § 9607(a). *See Pakootas v. Teck Cominco Metals*, 452 F.3d 1066 (9th Cir.2006); *Carson Harbor Village, LTD v. County of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir.2006); *San Diego Unified Port District v. TDY Industries, Inc.*, Case No. 03cv1146–B(POR), 2006 WL 762838, n. 6 (S.D.Cal. March 15, 2006) (Brewster, J.)(same). Section 9607(a) establishes four categories of PRPs. PRPs are: (1) current owners or operators of a facility; (2) persons who owned or operated[6] a facility in the past at a time of hazardous substance disposal; (3) persons who arranged for disposal or treatment of hazardous substances at a facility (*i.e.*, "arrangers"); and (4) persons who accepted hazardous substances for transport to disposal or treatment facilities (*i.e.*, "transporters").

## C. *RCRA*

Plaintiffs also seek injunctive relief under RCRA, 42 U.S.C. § 6972(a)(1)(B) (the third claim for relief) alleging that Defendants caused lead shot and target debris to be discarded and thus to become hazard-

---

**5.** A "PRP" is a "potentially responsible party" under the statute. *Id.* at 945.

**6.** The statutory language of § 107(a)(1), "owners and operators of ... a facility," according to the Supreme Court, means either owners or operators—not simply persons who both own and operate. *United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 1886, 141 L.Ed.2d 43 (1998) ("[A]ny person who operates a polluting facility is directly liable for the costs of cleaning up the pollution ....

*This is so regardless of whether that person is the facility's owner,* the owner's parent corporation or business partner, or even a saboteur who sneaks into the facility at night to discharge its poisons out of malice.") (emphasis added). The distinction could be important in this case where, for example, Defendant Olin was never an owner of the shooting range but was a franchisor which might be subject to liability as an "operator" of the shooting range owned by its franchisee.

ous solid waste that presents an imminent and substantial danger. "RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 483, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). In order for RCRA to apply, there must be "discarded" "hazardous waste." *See* 42 U.S.C. § 6903(5).

# IV. DISCUSSION

## A. CERCLA Liability

The legal landscape of firing range liability under CERCLA is still wild and untamed. Decisions involving CERCLA's safe harbor provision for consumer products in consumer use are scarce. Cases about trap and skeet ranges are hard to find.

Plaintiffs' lawsuit tests the outer bounds of several terms and concepts in this unusual setting. For example, it must be determined whether lead from shotgun shells and chemicals in clay targets falling naturally to the ground as a result of trap and skeet shooting can turn a site into a hazardous waste "facility," whether lead is thereby "released" into the environment, and whether the resulting accumulation of lead and targets and the mere passage of time constitutes a "disposal" of "hazardous waste."

### 1. "FACILITY"

Whether any party can be held liable to contribute to remediation costs under Plaintiffs' CERCLA claim depends in the first instance upon the shooting range being deemed a "facility" under CERCLA. *See Carson Harbor Village, LTD v. County of Los Angeles,* 433 F.3d 1260, 1265 (9th Cir.2006) ("To establish a *prima facie* case under [42 U.S.C.] § 9607(a), the plaintiff must show that (1) the property at issue is a 'facility' as defined in 42 U.S.C. § 9601(9) . . . ."); *see also San Diego Uni-*

*fied Port District v. TDY Industries, Inc.,* Case No. 03cv1146–B(POR), 2006 WL 762838 n. 6 (S.D.Cal. March 15, 2006) (Brewster, J.)(same).

Under CERCLA, a "facility" is defined as: "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel." Title 42 U.S.C. § 9601(9). Part (A) of the facility definition does not apply to the range as the area is not a building, structure, installation, equipment, pipe or pipeline, well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft. Part (B), on the other hand, is much more encompassing: including within the term any area where a hazardous substance, in any quantity, has been deposited, stored, disposed of, placed, or otherwise come to be located.

### a. Lead is a hazardous substance

■ There is no dispute that lead shot and clay target waste was deposited, or at the very least, came to be located on the subject property during the operation of the shooting range. Lead in any amount is a hazardous substance. *A & W Smelter and Refiners, Inc. v. Clinton,* 146 F.3d 1107, 1110 (9th Cir.1998). The amount of lead is not significant. *Id.* ("Drop an old nickel that actually contains nickel? A CERCLA violation. Throw out an old lemon? It's full of citric acid, another hazardous substance."). Moreover, the Ninth Circuit and other courts have given CERCLA provisions broad interpretation

to accomplish the remedial goals of the Act (*i.e.,* the goal of addressing "the problem of inactive and abandoned hazardous waste disposal sites"). *3550 Stevens Creek Associates v. Barclays Bank of California,* 915 F.2d 1355, 1363 (9th Cir.1990), *cert. denied,* 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991) (*citing* U.S.Code Cong. & Admin. News 1980, at 6119, 6125). Thus, without the safe harbor provision for consumer products in consumer use, a shooting range would undoubtedly fall within part (B) of the broad "facility" definition. On the other hand, if the hazardous substance-containing shotgun lead and clay target debris which has come to be located on the site is a "consumer product in consumer use," or if the entire range is a "consumer product in consumer use," then a fair reading of the statute would mean that a shooting range would fall outside the definition of a CERCLA "facility."

#### b. Lead shot as a consumer product

 The site was raw undeveloped land prior to its use in 1965 as a shooting range. There is no evidence that any hazardous substances had been deposited or disposed of on the site prior to the shooting activities. In other words, the site could not have been a CERCLA "facility" until after the first clay target was released and the first shotgun was fired and lead shot and clay target fell to the ground.[7] As mentioned earlier, there is no minimum amount of lead required for the lead to qualify as a hazardous substance. The lead shot from a single shotgun shell or the lead bullet from a single round of ammunition meets the definition of a haz-

ardous substance for purposes of CERCLA. The central question in this context is whether the ammunition and clay targets coming to be located on the shooting range were consumer products in consumer use. The undisputed evidence in this case indicates that the range was used during its history as a public shooting range for sport and recreation. Moreover, the ammunition and targets expended at the range were manufactured for consumers. In these circumstances, the Court finds that the shooting range is anchored in CERCLA's safe harbor provision for consumer products.

In the view of this Court, shotgun shells are consumer products. Clay targets are consumer products. When a sportsperson came to the range for recreational target practice, they would use these two consumer products by shooting at a consumer product (the clay target) with a consumer product (a shotgun shell). When the resulting hazardous substances came to be located on the range in the process of the consumer products being used by a consumer, the range fell within the exception to CERCLA's definition of a "facility."

#### c. Military and government shooters might not be "consumers"

 There are other contexts which could lead to a different outcome. For example, a military shooting range used to train government troops using military-issued ammunition would clearly not fall within the "consumer product in consumer use" exception. In the same way, a police range used by law enforcement for their official duties would fall outside the

---

7. Actually, the site could not have been a CERCLA facility until 1980 when CERCLA was passed into law. "There will always be a problem with fairness and truth when the law makes people liable for something that was done so long ago." *Western Properties Service Corp. v. Shell Oil Co.,* 358 F.3d 678, 692 (9th Cir.2004) (finding equitable defenses such as laches not a bar to CERCLA liability for site with 50–year old "cow-eating" acid pits). But no Defendant complains about CERCLA's retroactive application in this case. Thus, retroactivity is presumed for purposes of these motions.

CERCLA exception. Likewise, the safe harbor provision would be inapplicable to a site used by an ammunition manufacturer for research and development or quality control. However, these are scenarios not presented in this case.

### d. "Facility" is interpreted broadly, but not without limit

Plaintiffs make several arguments against the application of the consumer product exception for this case.[8] First, Plaintiffs point out that courts have expansively interpreted the term "facility" to encompass any site where hazardous substances have come to be located, citing *inter alia, 3550 Stevens Creek*, 915 F.2d at 1360, n. 10. The Ninth Circuit in *3550 Stevens Creek* makes the statement that, "the term 'facility' has been broadly construed by the courts, such that 'in order to show that an area is a facility, the plaintiff need only show that a hazardous substance under CERCLA is placed there or has otherwise come to be located there.'" *Id.* (citations omitted). While this is an accurate statement about the broad language of the "facility" definition, the Ninth Circuit does not address the consumer product exception. The defendant in *3550 Stevens Creek*, was not contesting the application of the CERCLA facility definition. *Id.* at 1360 ("[Defendant] does not contend that a structure built with asbestos insulation and fire retardants is not a 'facility' within the meaning of CERCLA."). Instead, *3550 Stevens Creek* held that CERCLA did not create a private cause of action under § 107(a) for the voluntary removal of asbestos from a commercial building. *Id.* at 1365 (noting such would be an "improvident interpretation of a statute that Congress never intended to apply in this context."). Thus, to read *3550 Stevens Creek* as Plaintiffs do would be to read CERCLA's application without

limit and the consumer product exception completely out of the statute. The language of the statute does not permit such a limitless application. *Id.* at 1363 ("However, we must reject a construction that the statute on its face does not permit, and the legislative history does not support."). While courts have read the definition of "facility" expansively, they do so in general terms without focusing on the consumer product exception. Few courts have attempted to identify the contours of the consumer product safe harbor contained in the same definition. *See, e.g., Uniroyal Chemical Co. v. Deltech Corp.,* 160 F.3d 238, 254 (5th Cir.1998) ("It does not appear that this Court, nor any court in the United States Court of Appeals, has authored a definitive opinion on the meaning of the consumer product exception.").

### e. PRP exceptions are not relevant

 Plaintiffs next argue that the four exceptions to CERLCA PRP liability set forth in § 9607(b) are narrowly interpreted. While this is true, the statutory exceptions to liability come into play only after the definition of "facility" is found to apply to a particular site. Here, the shooting range site does not qualify as a "facility" and the other exceptions to PRP liability do not come into play.

### f. No direct precedent for public shooting ranges

Plaintiffs next argue that substantial judicial and EPA precedent establish that shooting ranges are CERCLA "facilities." However, Plaintiffs overstate the quantity and quality of the precedent. Actually, there is very little judicial precedent—none on point—and EPA inaction tends to support this Court's finding that a public shooting range is not a "facility."

8. The Court asked for supplemental briefing on this issue.

### 1. The *Kamb* case is about government users, not consumer users

██ Plaintiffs chiefly rely on the only reported federal court CERCLA decision involving a shooting range, *Kamb v. U.S. Coast Guard,* 869 F.Supp. 793 (N.D.Cal. 1994), for the proposition that a former shooting range is a CERCLA "facility." However, *Kamb* cannot support the heavy weight Plaintiffs place upon it. First, the decision of another district court is not controlling. Second, the decision is not persuasive. The decision is not persuasive because the *Kamb* court never addressed the consumer product exception. In fact, in its recitation of the CERCLA "facility" definition the *Kamb* decision completely omits the language of the consumer product exception. *Id.* at 797. The court set forth parts (A) and (B) of the definitions ("Under CERCLA, the term 'facility' is broadly defined as: ... (A) Any building, structure, installation, equipment, pipe or pipeline ..., well, pit pond, lagoon, impoundment ditch, landfill, stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; ...."), but omits the safe harbor language from the statute: *"but does not include any consumer product in consumer use or any vessel." Id.* (ellipses in original) (emphasis added). The consumer product exception was simply not considered in *Kamb.*

Moreover, there was good reason for not considering the consumer product exception in *Kamb. Kamb* was an action brought against government defendants—including the United States Coast Guard, the California Highway Patrol, the County of Mendocino, and the City of Fort Bragg, California. The shooting range site was used by employees of these governmental entities for target practice. As the court noted, "Defendants United States, the State of California, the County of Mendocino,

and the City of Fort Bragg each have admitted that its personnel discharged firearms containing lead bullets at the Site, thereby contributing, to some extent, to the contamination." *Id.* at 798. Although "consumer" is not defined in CERLCA, it is entirely appropriate to treat the employees of the government defendants in *Kamb* as something other than consumers. If the government defendants were not consumers, the consumer exception would simply have no application. Consequently, that court had no occasion to determine whether a shooting range for non-government recreational shooters would come within the "consumer product in consumer use" exception. To sum up, the only reported CERCLA decision involving a shooting range offers no guidance as to whether the consumer product exception applies to the shooting range at issue in the case at bar. *Kamb* misses the target.

### 2. Other cases do not address the consumer product exception

Plaintiffs also cite to three unpublished shooting range cases for the remainder of their "substantial precedent" argument. In *Aggio v. Aggio,* 2005 WL 2277037 (N.D.Cal. Sept.19, 2005), a court denied a motion to dismiss a CERCLA claim against a gun club. It did so without ever identifying or addressing the consumer product exception. In *South Gate Rod & Gun Club v. City of South Gate,* 2005 WL 2659540 (Cal.2005), a California state court simply observed that a companion federal case existed involving a shooting range and CERCLA cost recovery suit. The final citation is simply to a complaint against a shooting range filed in another district (*i.e., The Ryland Group, Inc. v. The Payne Firm, Inc.,* Case No. 1:04cv381–WHR (S.D.Ohio)). Plaintiffs concede that none of these actions specifically address the "facility" issue but suggest that "it is telling that the exception

does not appear to have precluded any of the lawsuits." This Court cannot agree that a filed complaint, a state court observation that a federal case has been filed, and a denial of a motion to dismiss that omits any mention of the CERCLA "facility" definition and its consumer product exception, tells anything about whether a public shooting range used for sport or recreation falls within or without the definition of a CERCLA facility.

### g. Deference to EPA's interpretation

 Plaintiffs next argues that the United States Environmental Protection Agency "considers contaminated former shooting ranges to be CERCLA facilities" and that the EPA's conclusion is entitled to substantial deference. Again, Plaintiffs overstate their case. First, if Congress has already spoken to the precise question at issue, there is no reason to defer to an agency's interpretation of the statute. *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. On the other hand, if the statute is silent or ambiguous, or where Congress has explicitly left a gap for the agency to fill, the agency interpretation is given substantial deference. *Id.* at 843–44, 104 S.Ct. 2778.

In this case, the EPA is not a party and the EPA has not filed an amicus brief. Plaintiffs do not point to, and the Court has not identified, published regulations by the EPA defining what constitutes a "consumer product in consumer use." More to the point, the EPA has not published regulations defining a public shooting range as a CERCLA "facility." Had the EPA done

so, and assuming for the sake of argument that the intent of Congress is unclear, the EPA's rules and regulations would be due considerable deference. *A & W Smelter*, 146 F.3d at 1111.

### h. EPA Region 2 Best Practices Manual

However, instead of agency rules or regulations, Plaintiffs argue that a publication produced by the RCRA Compliance Branch of EPA's Region 2 office in New York, New York, entitled *Best Management Practices for Lead at Outdoor Shooting Ranges*, "is compelling evidence of the agency's views." This Court disagrees for a number of reasons. One problem with Plaintiffs' reliance on the publication is the EPA's own disclaimer in the manual: "This guidance does not constitute rulemaking by the EPA and may not be relied on to create a substantive or procedural right or benefit enforceable, at law or in equity, by any person." *Id.* at 3. Another problem with relying on the manual for evidence of the agency's views is that it contains only the views of one of the ten regional offices of the EPA.[9] Finally, the manual goes only so far as to say that a shooting range *may* be liable under CERCLA for cleanup costs. The manual does not distinguish between types of shooters (sportspersons, law enforcement officers, military, or manufacturers), or types of sites (sites where lead is present only from recreational shooting versus lead brought on to the site from elsewhere or sites where lead has been purposefully disposed). Some types of shooters and some types of sites qualify for the consumer product safe harbor provision while others would not. The EPA Region 2 *Best Management Practices* manual is admittedly advisory, does not constitute official rulemaking, and at best is entitled to slight

---

9. EPA Region 2 covers New Jersey, New York, Puerto Rico, and the U.S. Virgin Islands. Region 9 covers California, Arizona, Nevada, Hawaii and other pacific islands.

deference. *A & W Smelter,* 146 F.3d at 1112 ("Ad hoc agency action...is entitled to some deference, but not all deference is created equal....How much deference an agency is due depends in part on such factors as how much deliberation went into reaching it and whether the decision fits with a policy the agency has consistently followed.").

### i. Six administrative actions out of 9,000 possible shooting ranges

Plaintiffs also point to administrative settlements or consent decrees regarding six shooting ranges.[10] The EPA Region 2 *Best Management Practices* manual estimates that there are in existence 9,000 non-military shooting ranges within the United States. EPA actions taken against six, out of 9,000 shooting ranges, hardly reflects an agency judgment that the typical shooting range qualifies as is a CERCLA "facility." In fact, the EPA's limited enforcement activity, the EPA's absence in this case, and Region 2's publication of a manual suggesting best practices for operating a shooting range (as opposed to publishing a warning bulletin advising the closure of shooting ranges), more realistically reflects an agency judgment that most shooting ranges do not qualify as CERCLA hazardous waste facilities.

### j. EPA reporting requirements are broader than statutory liability

Plaintiffs also argue that the EPA rejected efforts to exempt shooting ranges from CERCLA in a Rule adopted in 1993 as evidence that the agency considers all shooting ranges to be CERCLA facilities. *See,* 58 *Fed.Reg.* 35314 (June 30, 1993). In that rule, the EPA made adjustments to the quantities of various hazardous substances which are required to be reported

to the EPA under §§ 102 and 103 of CERCLA. The weakness of Plaintiffs argument in this respect is that CERCLA's reporting requirements in §§ 102 and 103 are broader than the statute's definition of "facility" in § 101. For example, § 103 imposes a reporting requirement on "any person in charge of a vessel," while the definition of a "facility" in § 101(9) excludes a vessel: "[t]he term 'facility' ... does not include any consumer product in consumer use or any vessel." In the context of reporting requirements, in its response to public comments, the EPA does note that, "Congress did not create an exemption from CERCLA reporting requirements for releases associated with shooting at target ranges." *Id.* at 35320. And yet, the EPA Rule explains the only in certain instances is a release at a shooting range required to be reported at all. For example, the Rule states, "EPA has established by regulation that notification of a release of an RQ [reportable quantity] of solid particles of lead metal *is not necessary* if the diameter of the lead metal particles released is greater than 100 micrometers." *Id.* (emphasis added). Consequently, the Rule cited by Plaintiffs is not indicative of the EPA's view of whether or not all public shooting ranges fall within CERCLA's definition of a "facility," only that in some instances a range operator has a reporting obligation. The EPA simply has not offered a regulatory interpretation on this question of whether a public trap and skeet range comes within the CERCLA safe harbor of the "consumer product in consumer use" exception.

### k. The Military Munitions Rule

The EPA has issued a final Rule on the closely-related question of how to treat military munitions under RCRA.[11]

---

**10.** None of the documents address the application or non-application of the consumer

product in consumer use safe harbor provision.

**11.** Neither Plaintiffs nor Defendants discuss

In this Rule, the EPA finds that munitions used for their intended purposes are not "solid waste" for regulatory purposes. *See*, 62 *Fed.Reg.* 6621 (Feb. 12, 1997) (The "Military Munitions Rule").[12] The Rule explains, "[i]n EPA's opinion, the use of munitions does not constitute a waste management activity because the munitions are not 'discarded' .... Rather, the firing of munitions is within the normal and expected use of the product." *Id.* at 6630. The Rule continues, "[t]his is the same position EPA took regarding the discharge of ammunition and expended cartridges in an interpretative letter...addressing the issue of the 'applicability of RCRA regulations to shooting ranges.'" *Id.* Moreover, the Rule indicates that the EPA took the same position in its amicus brief in *Connecticut Coastal Fishermen's Assoc. v. Remington Arms Co.*[13], wherein it stated the Agency's views that "lead shot and clay target debris deposited on land and in water in the normal course of skeet and trap shooting" is not "solid waste" and the that its "regulatory jurisdiction does not apply to products that are deposited onto the land in their ordinary manner of

use." *Id.; see also Remington Arms*, 989 F.2d at 1315 ("The EPA, as *amicus*, concludes that the lead shot and clay targets discharged by patrons of Remington's Gun Club do not fall within the narrow regulatory definition of solid waste.").[14] That the EPA formally concludes that lead shot and target debris falling to the ground in the normal course of shooting is not solid waste and not within its RCRA regulatory jurisdiction, strongly suggests that the same type of activity would also fall outside of the agency's CERCLA remediation jurisdiction.

### l. An Air Force report

In another attempt to find official support for their "facility" interpretation, Plaintiffs cite an Air Force report: "Technical Protocol for Determining Remedial Requirements for Soils at Small–Arms Firing Ranges," prepared by a private engineering firm for the Air Force Center for Environmental Excellence Technology Transfer Division (AFCEE/ERT) at Brooks Air Force Base, Texas. The 30–page document includes only two sentences on the subject of CERCLA, opining that the "[c]leanup of small-arms ranges

---

the Rule.

**12.** The validity of the Munitions Rule was upheld by the District of Columbia Court of Appeals in *Military Toxics Project v. Environmental Protection Agency*, 146 F.3d 948, 955 (D.C.Cir.1998) (noting that the preamble to the Rule explains that "firing a munition does not constitute discarding it, so a munition does not become a regulatory solid waste simply by hitting the ground and remaining there").

**13.** 989 F.2d 1305 (2nd Cir.1993).

**14.** The *Remington Arms* court asked, "At what point after a lead shot is fired at a clay target do the materials become discarded? Does the transformation from useful to discarded material take place the instant the shot is fired or at some later time?" *Id.* at 1314. The EPA Military Munitions Rule postpones final action and leaves unanswered the ques-

tion of whether a munition left on a closed range is transformed by the passage of time and neglect into something that meets the RCRA definition of "solid waste." 62 Fed. Reg. at 6632. The Munitions Rule says used munitions become solid waste, not by the passage of time when left alone, but when they are removed from their landing site and managed off-range, when they are disposed of (*i.e.*, additionally buried or landfilled) on-range, when they land off-range and are not recovered (signifying abandonment), or when the munitions are not used as munitions are intended to be used. Moreover, lead from spent ammunition may be profitably recovered from a shooting range and evidence suggests that at this site, in particular, lead reclamation efforts were undertaken periodically throughout its years of operation as a shooting range.

should generally follow CERCLA...and all relevant CERCLA guidance." *See,* § 2.2.2.2, page 2–5. The same document relies on the EPA Military Munitions Rule as controlling for the proposition that lead bullets in soils at active and inactive ranges are not considered hazardous waste. *Id.* at 2–3 ("The Military Munitions Rule presently has the following implications for the Air Force with respect to small-arms firing ranges: Bullets in soils at active and inactive ranges are currently not defined as a solid waste, and therefore would not be considered a hazardous waste while the soils are left in place, even if the soils failed the TCLP test for leachable lead."). Simply put, the Air Force report does not help Plaintiffs' argument.

### m. Meaning of term "consumer product"

 Finally, Plaintiffs turn from their request for EPA deference and urge their own interpretation of the statutory language.[15] Plaintiffs argue that for the consumer product exception to apply, the shooting range *itself* must be a consumer product. Plaintiffs then argue, that a trap and skeet range is a business and that it is not a consumer product. This Court disagrees. In order to interpret a statute, a court must construe what Congress enacted by looking first to the plain language of the statute and resorting to legislative history if it clearly indicates that Congress meant something other than what it said. *Carson Harbor Village, Ltd. v. Unocal Corp.,* 270 F.3d 863, 877 (9th Cir.2001),

*cert. denied,* 535 U.S. 971, 122 S.Ct. 1437, 152 L.Ed.2d 381 (2002) (construing the CERCLA term "disposal") (citations omitted). As mentioned earlier, "facility" is defined in the statute at § 9601(9). According to § 9601(9), the meaning of "facility" excludes "any consumer product in consumer use or any vessel." The statute defines neither "consumer product" nor "in consumer use."[16] One commentator has observed that because of the lack of definition, courts have come to different conclusions on the outcome of cases applying the consumer product exception, and that it "is impossible to discern any trend in the courts' opinions." 147 A.L.R. Fed. 469 (2006) § 2(a) ("[T]he outcome of the cases in which courts have applied the consumer products exclusion has depended on the various views expressed by the courts with respect to the intended purposes of the exclusion. It is impossible to discern any trend in the courts' opinions."). Nevertheless, some guidance can be found in another statute. "Consumer product" was defined by Congress in the Consumer Product Safety Act as follows:

> The term "consumer product" means any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise....

15. Plaintiffs also argue the Congress intended the exception to apply only to individuals and not to businesses. While one might glean some support for the argument in the sparse legislative history, the actual language of the statute makes no distinctions based upon types of business entities or the business or non-business use of a site. It focuses on places. In contrast, Congress went into great detail describing business relationships elsewhere in CERCLA and could have done the same in the consumer product exception if it had intended to so limit the definition. Because the "facility" definition focuses on places, not on persons or businesses, Plaintiffs' argument finds no support in the statute and is unavailing.

16. CERCLA does define "vessel" as a watercraft. *See,* 42 U.S.C. § 9601(28).

*See,* 15 U.S.C. § 2052; *Uniroyal Chemical Co., Inc. v. Deltech Corp.,* 160 F.3d 238, 255 (5th Cir.1998) (quoting definition in Consumer Product Safety Act and finding other similar definitions found in the Fair Packaging and Labeling Act, 15 U.S.C. § 1451, *et seq.,* the Magnuson–Moss Warranty–Federal Trade Commission Improvement Act, 15 U.S.C. § 2301, *et seq.,* and the Energy Policy and Conservation Act, 42 U.S.C. § 6291, *et seq.*).

Certainly, according to the C.P.S.C. definition, shotgun shells and clay targets are consumer products as they are products "for sale to a consumer for use ... in recreation" or "for the personal use, consumption or enjoyment of a consumer ... in recreation." Target shooting with firearms and live ammunition has been a source of recreation and amusement at least since the year 1885 when Annie Oakley joined Buffalo Bill's Wild West Show and performed extraordinary sharpshooting feats. Shotguns and clay targets are widely sold to consumers in sporting goods stores for recreational target practice and hunting. As a result, it is fair to say that lead shot and target debris that falls to the ground at a non-military shooting range comes from "consumer products." On this point there is really no dispute. More-

over, it is the act of consumers using these consumer products that results in lead and target debris coming to rest on the ground of a shooting range. A shooting range exists for only one reason: as a place for consumers to safely make use of their firearms, ammunition and targets for recreation or personal use. In other words, lead and target debris comes to be located on a shooting range as a direct result of consumer products being put to consumer use. At the shooting range in this case, the only source of the lead and target debris which came to be located on the site was consumers using these consumer products for target practice.[17] Consequently, shooting range activities fit easily within the ordinary meaning of the consumer product exception language.[18] In the sense of the statute, the site would be a "facility" because hazardous substances came to be located on the range, but because the hazardous substances came to be located on the range because of, and only because of, consumer products being used by consumers, the site is not included in the definition of a "facility."

### n. CERCLA's odd syntax

Admittedly, § 9601(9) has an odd syntax[19] which one court has described as "a

17. There is no evidence that the site was contaminated *prior* to its use as a trap and skeet range. Nor is there any evidence that hazardous substances were the byproduct of a manufacturing process or brought from offsite and dispersed on to the range (other than through the act of shooting firearms) as a means of disposal.

18. Other fact scenarios have required a more strained understanding of what a "consumer product in consumer use" entails. For example, in one case, electrical transformers containing dielectric fluid with polychlorinated biphenyls ("PCBs") were determined to be "consumer products in consumer use." *See, Electric Power Board of Chattanooga v. Westinghouse Electric Corp.,* 716 F.Supp. 1069 (E.D.Tenn.1988), *affirmed,* 879 F.2d 1368

(6th Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 724, 107 L.Ed.2d 743 (1990). In another case a house containing asbestos was determined to be a "consumer product in consumer use" and therefore *not* a CERCLA facility. *See, Kane v. United States,* 841 F.Supp. 881 (E.D.Ark.1993), *affirmed,* 15 F.3d 87 (8th Cir.1994).

19. "Clearly neither a logician nor a grammarian will find comfort in the world of CERCLA, It is not our task, however, to clean up the baffling language Congress gave us by deleting the words...." *Carson Harbor Village, Ltd. v. Unocal Corp.,* 270 F.3d 863, 883 (9th Cir.2001). "A multitude of courts have roundly criticized [CERCLA] as vague, contradictory, and lacking a useful legislative history." *Uniroyal v. Deltech,* 160 F.3d at 246.

latent ambiguity." *Uniroyal v. Deltech*, 160 F.3d at 246 ("We cannot begin our inquiry into [the] meaning of the consumer product exception until we first resolve a grammatical ambiguity hidden within § 9601(9)."). The *Deltech* court described the grammatical problem this way:

> A close reading...reveals a significant question as to whether the phrase "but does not include any consumer product in consumer use or any vessel" modifies the overall definition of "facility," or whether it only modifies the preceding language in subparts (A) and, or, (B).

*Id.* at 253. The *Deltech* court and the court in *Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746 (7th Cir.1993), adopted an interpretation that parses the language in such a way as to exclude consumer products that are somehow facilities *themselves*, and not facilities that *contain* consumer products. *Uniroyal v. Deltech*, 160 F.3d at 253; *Amcast v. Detrex*, 2 F.3d at 750. Based on these cases, Plaintiffs urge the related argument that the shooting range, itself, must be the "consumer product" and not a "facility" that contains a "consumer product." [20]

### *o. Deltech and Amcast are not persuasive*

However, the argument is unpersuasive in this case, First, even the *Deltech* court acknowledged that other courts have taken the opposite view. *Uniroyal v. Deltech*, 160 F.3d at 253 (*citing National R.R. Pas-*

*senger Corp. v. New York City Hous. Auth.*, 819 F.Supp. 1271, 1276 (S.D.N.Y. 1993); *Vernon Village, Inc. v. Gottier*, 755 F.Supp. 1142, 1151 (D.Conn.1990); and *Electric Power Bd. of Chattanooga v. Westinghouse Electric Corp.*, 716 F.Supp. 1069, 1080 (E.D.Tenn.1988)).

Second, both *Deltech* and *Amcast* involved tanker trucks that spilled hazardous chemicals used in manufacturing—a far cry from an ordinary target range. In *Deltech* there was a tanker truck transporting a mixture of vinyl toluene. The tanker had picked up the chemicals from an industrial facility in Alabama and was on its way to another industrial facility in Louisiana. There the chemical mix was to be used for the production of a chemical resin which, in turn, would be used to make other products like paint and glue. *Deltech*, 160 F.3d at 240 and n. 2. Unfortunately, the tanker truck ruptured at a trucking terminal between the two industrial plants. Not surprisingly, the *Deltech* court ultimately decided that neither the tanker truck, nor the trucking terminal at which the chemical spill occurred, qualified as a consumer product in consumer use. *Id.* at 257.[21]

*Amcast* also involved chemicals spilled from tanker trucks. In *Amcast*, a manufacturer in Indiana brought in tanker truck loads of a chemical solvent (trichloroethylene, or "TCE") to its plant for the production of copper fittings. When 800

---

"CERCLA is not a paradigm of clarity or precision. It has been criticized frequently for inartful drafting and numerous ambiguities attributable to its precipitous passage." *Rhodes v. County of Darlington*, 833 F.Supp. 1163, 1174 (D.S.C.1992).

**20.** A shooting range, open to the public, may very well qualify as a "consumer product." It typically has no other purpose than to be a place where consumers use consumer firearm products for recreation. For recreation, consumers need *places* to play. Golf courses and

tennis courts, baseball fields and soccer fields, go-kart tracks and swimming pools; all are sites created and maintained for no other purposes than to provide places for consumers to use their consumer products in recreation. Thus, it may well be reasonable to consider all such places as "consumer products" beyond the scope of CERCLA's hazardous waste machinery.

**21.** It is not all obvious where in the *Deltech* fact scenario one could arguably find any consumer product in any consumer use.

gallons of TCE was discovered in the soil and groundwater beneath an adjacent pharmaceutical plant, it was discovered that the tanker trucks often spilled TCE onto the ground of the copper manufacturer's plant. *Amcast*, 2 F.3d at 748. Apparently because neither party argued that the term "consumer product" was limited to only "consumer products used by consumers as distinct from ones consumed by business firms and other institutions," the court tried to address the question whether the consumer product exception applied to the chemicals in the tanker trucks or the tanker trucks containing the chemicals. *Id.* at 750.[22] As in *Deltech*, *Amcast* found that the tanker trucks spilling manufacturing chemicals were not consumer products in consumer use. *Id.* Without criticizing the reasoning in either case, the fact patterns are so far removed from the context of a shooting range that the decisions are not persuasive on the question before this Court.[23]

### p. Circularity of Plaintiffs' approach

Third, the view that the shooting range itself must be the "consumer product" requires a bit of circularity in the definition.[24] In Plaintiffs' view, the shooting range site becomes a "facility" because (the consumer products of) ammunition lead and clay targets (in the consumer use

of target practice) come to be located on the site, although the definition of a "facility" specifically excludes consumer products in consumer use. Put differently, following Plaintiffs' approach, even though a "facility," by definition does not include consumer products in consumer use, when consumer products in consumer use come to be located on a site, the site becomes a "facility." Unacceptably, this result either eviscerates the Congressional intent for the consumer product exception or requires a cramped meaning of the concept of "facility."

### q. Absurd results not intended by Congress

To adopt Plaintiff's approach would mean that a shotgun shell would be a "facility" if not for the exception and that a site is a "facility" when it contains only consumer products that would be "facilities" if not for the consumer product exception. This strains the English language. In other contexts, Plaintiff's approach would lead to absurd results. For example, a home would become a "facility" when a student uses lead solder on a science fair project and the yard would become a "facility" when the student's father spreads lawn fertilizer or pesticide. Meanwhile, the swimming pool would become a "facility" when a bottle

---

**22.** Once again, it is not at all obvious where in the fact scenario one finds any consumer product in any consumer use without doing great violence to the meaning of the penultimate term "consumer."

**23.** In the end, the consumer product exception discussion in *Amcast* appears to be *obiter dicta*, as that court goes on to address the real issue, "irrespective of the issue of consumer product and consumer use," of whether the truck transport service or the copper manufacturer was liable for the chemical spills. *Id.* at 751. It held that the manufacturer was liable under CERCLA for chemical spills from its own trucks, but not for spills from the common carrier trucks it hired. *Id.*

**24.** In the only Ninth Circuit decision to mention the consumer product exception, the court explained in a footnote that a commercial office building "containing asbestos building material as distinguished, for example, from containers of such materials for consumer use," satisfies the broad definition of "facility" in CERCLA. *People of the State of California v. Blech*, 976 F.2d 525 (9th Cir. 1992). All parties in the case at bar agree that *Blech* does not control the outcome of this case. In the end, *Blech* held simply that Congress did not intend for CERCLA to create a private cause of action for recovering the cost of removing asbestos building materials from a commercial structure. *Id.* at 527.

of chlorine or muriatic acid is poured into the water during routine maintenance and the garage would become a "facility" when a car battery or a copper pipe is stored there. A water fountain in the public square would become a "facility" when children toss in coins [25] and a lake would become a "facility" when fishermen lose lead sinkers on the bottom.[26]

Surely, Congress did not intend to sweep these places within the classification of CERCLA "facilities." Admittedly, discerning Congressional intent from the legislative history for CERCLA is "somewhat of a snark hunt." *Carson Harbor*, 270 F.3d at 885. Of what exists, little pertains to the consumer product exception. Nonetheless, the fact that no mention is made of a lead accumulation problem on the approximately 9,000 non-military shooting ranges in operation in the country suggests that Congress did not consider the ranges to be a problem. This view is further buttressed by the fact that Congress appropriates $8,000,000 every year to use in hunter safety programs and "the enhancement of construction or development of firearm shooting ranges and archery ranges, and the updating of safety features of firearm shooting ranges and archery ranges," (*see*, 16 U.S.C. § 669h–1(a)(1)), and a search of the Federal Register indicates that the Department of the Interior routinely considers proposals to use federal lands for shooting ranges.

### r. No CERCLA claim for public shooting range

To sum up, the Court finds that the trap and skeet range site falls within the consumer product exception to the CERCLA definition of a "facility" and that, as a result, there is no private cause of action under CERCLA for recovery of the cost of removing spent ammunition and target debris. Therefore, summary judgment is warranted for all defendants on the CERCLA claim.

### 2. ADDITIONAL GROUNDS FOR SUMMARY JUDGMENT

If, on the other hand, the consumer product exception does not apply in this case, then the range falls within the definition of a "facility." However, before liability attaches three additional elements must be proven: first, that there has been an actual or "threatened release" of a hazardous substance from the "facility"; second, that the release has caused Plaintiffs to incur response costs that are both "necessary" and "consistent with the national contingency plan"; and third, that each of the Defendants are PRPs described in § 9607(a). *Pakootas v. Teck Cominco Metals*, 452 F.3d 1066 (9th Cir.2006); *Carson Harbor Village, LTD v. County of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006);

### a. No Actual or threatened "release"

■ "The second element of liability under CERCLA is that there must be a 'release' or 'threatened release' of a hazardous substance from the facility into the environment." *Pakootas*, (*citing* § 9607(a)(4)); *A & W Smelter and Refiners v. Clinton*, 146 F.3d 1107, 1111–12 (9th Cir.1998). CERCLA defines a "release," as "any spilling, leaking, pumping, pouring,

---

**25.** According to www.pennies.org, pennies minted prior to 1982 (except during WWII) contain 95% copper (copper is a hazardous substance). According to the U.S. Mint, nickels, dimes and quarters now are made of 75% copper and 25% cupro-nickel alloy. *See* www.usmint.gov.

**26.** Other absurd results might include a country club clubhouse becoming a "facility" because a collection of lead crystal decanters came to be located there or a municipal sewer system becoming a "facility" because a homeowner uses Drano in a connected drain line.

emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22).

None of the defendants have moved for summary judgment on the specific ground that there was no release or threatened release. Nevertheless, it is a valid basis for granting summary judgment on this record. The Ninth Circuit has observed, "a district court 'may grant summary judgment on any legal ground the record supports.'" *Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1202 (9th Cir.2001) (quoting 6 James W. Moore, Walter J. Taggart and Jeremy C. Wicker, Moore's Federal Practice ¶ 56.14[1] (1994)); *compare Ahmad v. Furlong*, 435 F.3d 1196 (10th Cir.2006) (it is an open question whether Federal Rules permit a court to rule on issues only impliedly raised on summary judgment).

It could be argued that using a firearm results in a "release" of lead into the environment of the range. It could also be argued that there is *no* "release" into the environment when the lead is contained within the site boundaries where it may be thereafter picked up and recycled like golf balls on a driving range—as contrasted against shooting into a waterway and abandoned. In this case, there is no evidence that firearms were discharged into a waterway. As a result, there would be no "release" of hazardous substances into the environment beyond the range site. Once time passes, it could also be argued that accumulated lead shot could be "released" into the environment through leaching or seepage or a weed abatement technique known as "discing" (or "disking"). For example, the Ninth Circuit has held that where wind blows particles of hazardous substances from a pile of waste it is a "release." *See A & W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1111 (9th Cir.1998). There is no evidence of wind blowing lead shot off of the site in this

case. The Ninth Circuit has also held that a corroded drum leaking a hazardous substance on the ground is a "release." *United States v. Chapman*, 146 F.3d 1166, 1170 (9th Cir.1998). There is no evidence of corroded containers of lead at the site in this case. Summarizing these precedents, the Ninth Circuit has recently observed, "our precedents establish that the passive migration of hazardous substances into the environment from where hazardous substances have come to be located is a release under CERCLA." *Pakootas*, 452 F.3d 1066 (citing *A & W Smelter* and *Chapman*); *compare Carson Harbor Village, Ltd., v. Unocal Corporation*, 270 F.3d 863 (9th Cir.2001) (the passive migration of contaminants through soil is *not* a "disposal" under CERCLA).

The evidence is scant in this case as to whether any lead shot has passively migrated into the environment or migrated off the site. There is evidence that lead shot has been found both on the surface of the range and at depths up to two feet and in different places on the range. Lead below the surface is probably the result of past lead reclamation efforts, periodic discing for weed abatement (which tends to homogenize the top three to eight inches of soil depending on the diameter of the disc), or lead pellets falling into deep cracks in the dry, hard surface of the site. *See e.g.*, Declaration of Gary McCue in Support of Plaintiffs' Oppositions to Motions for Summary Judgment (dated March 8, 2006). McCue is Plaintiffs' leading geologist and hydrogeologist. McCue notes that, "concentrations of Lead in soil at places throughout the Site exceed 1,000 mg/kg, an order of magnitude higher than the 150 mg/kg lead cleanup goal for soil identified by TRC [the company employing McCue]...; Lead pellets and concentrations of Lead in soil appear at depth throughout the Site, in many cases more than two (2) feet below ground sur-

face...." *Id.* at ¶3. McCue continues, "one of the main reasons contamination is more widespread and deeper at the Site when compared to a typical trap and skeet range...is the reported disking of Site soil by prior shooting range owners and operators for purposes including weed abatement...Disking is a known range management activity that will cause the vertical and horizontal spreading of Lead pellets...." *Id.* at ¶4. Some of the lead movement may be attributable to Plaintiff Otay Land Company's own lead removal project in 2000. At that time, Otay Land Company "engaged in a Lead source removal project on the Site that removed more than 42,000 pounds of spent Lead pellets from Site soil." *Id.* at ¶8. There is no evidence, however, of any lead being found in a landfill on the site or anywhere off of the range site or in watercourses.

The evidence is unclear as to whether lead has "spill[ed], leak[ed], pump[ed], pour[ed], emitt[ed], empt[ied], discharg[ed], inject[ed], escap[ed], leach[ed], dump[ed], or dispos[ed] into the environment" by entering surface or ground water around the range. *See* 42 U.S.C. § 9601(22). McCue indicates that "concentrations of Lead in groundwater beneath the Site have exceeded applicable regulatory limits." Declaration of Gary McCue, at ¶3. However, in his deposition, McCue indicated that a test well placed in the Otay River flood plain and closest to the target debris field did not detect any lead in the groundwater.[27] *See* Exhibit 75 (deposition of Gary McCue, Vol. I, at 252–53), attached to Declaration of Derrick K. Watson in Support of Plaintiffs' Oppositions to Motions for Summary Judgment

(dated March 11, 2006). McCue also found no impact in surface water. He testified,

A. Well the way we handle that was we said, okay, let's sample surface water. *We did not find impact in the surface water,* and since the goal was to remove the materials anyways, because there was not an intent at any point to leave the material out there, we said, okay, there is no impact today. We don't need to look into the future because we're going to remove that material. It doesn't belong there.

Q. There is no impact, right?

A. In the surface water, is that what you mean?

Q. Correct. That was your conclusion?

A. *We collected three samples from the river valley, as I recall, and we did not find impact.*

*Id.* at 256–57 (emphasis added). Consequently, if a "release...into the environment" means the environment beyond the "facility" site, there is no genuine issue of fact that lead has not been released into the environment, and summary judgment would be granted for the Defendants. *But see Kamb v. United States Coast Guard,* 869 F.Supp. 793, 798 (N.D.Cal.1994) (finding "release" where lead concentrations in soil at a shooting range site exceeded 1,000 mg/kg and concentrations in water exceeded 5.0 ml/L).

### b. *Necessary and consistent response costs and lack of ripeness*

█ The second additional element required for a finding of liability is that the "release" has caused Plaintiffs to incur

---

**27.** Plaintiffs acknowledge in their brief that there is no proof yet as to the source of the lead in the site's groundwater. Plaintiffs note that, "[t]he cause of these [lead and perchlorate] concentrations is under study, but neither Plaintiffs' consultants, most of Defendants' consultants nor the lead agency, the

San Diego County Department of Environmental health can rule out Site contamination as the sole or contributing cause." Plaintiffs' Opposition to Defendant Olin Corporation's Motion for Summary Judgment (filed March 13, 2006), at 20.

response costs that are both "necessary" and "consistent with the national contingency plan." In *Carson Harbor Village, LTD. v. County of Los Angeles,* 433 F.3d 1260, 1269 (9th Cir.2006), the Ninth Circuit upheld the granting of summary judgment against a CERCLA plaintiff where there was no evidence that the plaintiff has substantially complied with the public participation and feasibility study requirements of the National Contingency Plan. In the present case, no Defendant has moved for summary judgment on this ground although the proposed Pre–Trial Order indicates that it will be an issue at trial. Nevertheless, it is a valid basis for ruling on this record. *Jackson Inc. v. Roe,* 273 F.3d at 1202.

Of course, if there has been no "release" or threatened release into the environment, then response costs were not necessary. Even if a response were necessary, it appears that Plaintiffs are still in the process of creating their remedial action plan. Only recently (in November of 2005) have Plaintiffs presented their Remedial Investigation and Feasibility Study to the San Diego County Department of Environmental Health. Declaration of Gary McCue, at ¶ 8. It is too early to know whether Plaintiffs will ultimately satisfy the "public participation requirement" or be inconsistent in other ways with the National Contingency Plan. *See Carson Harbor,* 433 F.3d at 1266 ("The public participation requirement has two main components."). For this reason, the CERCLA action may not yet be ripe for determination, and therefore, subject to dismissal. *See e.g., In re Dant & Russell, Inc.,* 951 F.2d 246, 250 (9th Cir.1991) (bare assertions that claimant will perform cleanup in the future do not amount to response costs incurred under § 9607(a)); *Gussack Realty Co. v. Xerox Corp.,* 224 F.3d 85, 92 (2nd Cir.2000) (awarding plaintiff money for future costs of response

remediation is not a remedy available under CERCLA).

### c. No "PRPs" because a range is not a place of "disposal"

■ Even if the range is found to be a CERCLA "facility," and if there has been a "release" or threatened release into the environment from the facility, and if the Plaintiffs' response costs have been necessary and consistent with the National Contingency Plan, in order to be made to contribute to the Plaintiffs' response costs, a Defendant must be a CERCLA potentially responsible party (or "PRP"). In this case, summary judgment is warranted for Defendants because there is no genuine issue of fact that any of the Defendants are PRPs, because in order to be a PRP, there must first be a "disposal" of a hazardous substance. There is no evidence of a "disposal." *Carson Harbor Village, Ltd. v. Unocal Corporation,* 270 F.3d 863, 867 (9th Cir.2001) ("Even if we assume that those costs were necessary, we still must decide whether defendants ... are PRPs; if not, summary judgment was nonetheless appropriate. Parsing the meaning of the term 'disposal' in § 9607(a)(2) lies at the heart of this question.").

#### 1. "At the time of disposal"

Under § 9607(a)(1) of CERCLA, a PRP may be a present owner or operator of a facility. None of the Defendants are present owners or operators of the shooting range site and Plaintiffs do not rest their claims on (a)(1). Instead, Plaintiffs claim that Defendants are liable under § 9607(a)(2) and (3). Under § 9607(a)(2), a PRP is "any person who *at the time of disposal* of any hazardous substance owned or operated any facility at which such hazardous substances were *disposed* of." (Emphasis added.) Each of the Defendants are alleged to be past owners or

operators of the firing range site. Under § 9607(a)(3), a PRP is an "arranger." That is, "any person who...arranged for *disposal* or treatment, or arranged with a transporter for transport for *disposal* or treatment, of hazardous substances...." (Emphasis added.) All of the Defendants are also alleged to have been "arrangers" of hazardous waste disposal at the site.

### 2. There must be waste to dispose

■■■■ "On a motion for summary judgment, the question is whether the factfinder could infer from all the circumstances that 'a transaction in fact involves an arrangement for the disposal or treatment of a hazardous substance.'" *Cadillac Fairview/California, Inc. v. United States of America*, 41 F.3d 562, 565 (9th Cir.1994) (focusing on arranger liability). The Achilles' Heel of Plaintiffs' approach in this case is that Plaintiffs spend most of their effort on proving Defendants were owners or operators or arrangers of a shooting range, while assuming that an ongoing "disposal" of lead has taken place. This cannot be assumed. Under Ninth Circuit precedent, there are at least two components to a CERCLA "disposal." On one hand, the hazardous substance must be *waste*. If it is not waste—if instead it is a useful product—then there is no disposal.

### 3. The useful product defense

CERCLA does not define "disposal" directly. Instead, "disposal" is given the meaning provided in the Solid Waste Disposal Act, 42 U.S.C. § 6903. *See*, 42 U.S.C. § 9601(29). In § 6903, "disposal" is defined as "the discharge [and so on] of any solid *waste* or hazardous *waste* ...." *A & W Smelter*, 146 F.3d at 1112 (quoting 42 U.S.C. § 6903(3)) (emphasis in original). In a case about a pile of ore containing small amounts of gold, silver, and lead, the Ninth Circuit explained, "[i]f the ore was a useful product, then it was not waste and

not subject to CERCLA. This has been called the useful product defense." *Id.*

### 4. Disposal requires active, not passive, involvement

■■■■ The other component identified by the Ninth Circuit is an active (not passive) involvement in the discarding of waste. In *Catellus Development Corporation v. United States*, 34 F.3d 748, 750 (9th Cir. 1994), the Ninth Circuit observed "we agreed with other circuits that 'disposal' refers 'only to an affirmative act of discarding a substance as waste, and not to the productive use of the substance.'"

■■■■ In this case, lead came to be located on the site as a result of the productive use of the lead. There is no evidence that lead was dumped on the site from an outside source. There is no evidence that the lead on the site came to be at the site from any activity other than target practice. Target practice or trap and skeet activities surely qualify as productively using lead-containing ammunition. If so, the sporting activity which resulted in lead shot or lead pellets being deposited at the site, is not a "disposal" of lead as contemplated by CERCLA.

### 5. Spent ammunition is not waste and is not discarded

This is entirely consistent with the official position taken by the Environmental Protection Agency in the 1997 Military Munitions Rule. *See* discussion of "solid waste" under RCRA, *infra*. Section G of the Rule finds that spent ammunition is "not a solid waste for regulatory purposes: (1) when a munition is used for its intended purpose...," and "[u]nder RCRA, the use of products for their intended purpose, even when the use of the product results in deposit on the land, does not necessarily constitute 'discard,' is not waste manage-

ment, and is not subject to regulation." 62 Fed.Reg. 6622, at 6628.

▇▇▇▇ Plaintiffs identify no evidence of a Defendant affirmatively acting to discard lead or target fragments as waste in the pedestrian sense of disposing of waste. Moreover, the lead from spent ammunition continues to be useful. It can be collected and sieved and re-loaded into new or reused shotgun shells. In other words, lead pellets sitting in soil on a shooting range are still not "waste." The record in this case contains undisputed evidence that on several occasions in the history of the range, spent lead shot was gathered and reclaimed from the site. Consequently, without evidence of additional actions by Defendants, all Defendants are entitled to summary judgment on this argument, for none qualify as PRPs without an occurrence of a past hazardous "waste" "disposal." *A & W Smelter,* 146 F.3d at 1112; *Catellus Development,* 34 F.3d at 750.

### 6. Passive migration of lead into soil is not a disposal

▇▇▇▇ There is an additional argument to be made: if lead shot is left on the range, over enough time it may migrate through the soil and become a disposal. On this theory, a prior owner might become a PRP simply because gradual passive migration of contaminants takes place during the time of ownership. However, the Ninth Circuit concluded that the opposite is true for purposes of CERCLA. In *Carson Harbor Village, Ltd., v. Unocal Corporation,* 270 F.3d 863, 881 (9th Cir. 2001), the court held that " 'disposal' does not include passive soil migration." It explained, "[i]n sum, we hold that, in light of the plain meaning of the terms used to define 'disposal' in 6903(3), the alleged passive migration of contaminants through the soil during the ... Defendants' ownership was not a 'disposal' under § 9607(a)(2) [of CERCLA]." *Id.* at 887; *see also Redevel-*

*opment Agency of the City of Stockton v. Burlington Northern and Santa Fe Railway Corporation,* Case No. 05–2087 DFL JFM, 2006 WL 931059 (E.D.Cal. April 11, 2006) (same). Consequently, any passive migration of lead into the site soil or water that has taken place over the years is not a disposal, and without a disposal, Defendants cannot be PRPs. Defendants would be entitled to summary judgment.

### 7. Periodic discing of range is not a disposal

Plaintiffs could argue, however, the periodic discing of the range provides the active element necessary to find a disposal took place. *Catellus Development,* 34 F.3d at 750 (" '[D]isposal' refers only to an affirmative act of discarding a substance as waste."); *see also Kaiser Aluminum & Chemical Corp. v. Catellus Dev. Corp.,* 976 F.2d 1338, 1340 (9th Cir.1992) (moving and spreading contaminated soil to an uncontaminated portion of the property constitutes a CERCLA "disposal"). In *Kaiser Aluminum,* the court held that a construction excavator was a PRP who "disposed" of contaminated soil. In that case, the contractor was hired to excavate and grade a portion of 346 acres for a housing development. The soil contained lead, asbestos, paint thinner and other hazardous substances deposited on the ground during the 1940's when the site was used for ship building. *Id.* at n. 1. In that case, the court held that disposal includes the process of "excavating the tainted soil, mov[ing] it away from the excavation site, and spread[ing] it over uncontaminated portions of the property." *Id.* at 1342.

▇▇▇▇ Plaintiffs here, however, do not identify evidence that contaminated range soil was excavated, moved away from the range, and spread over uncontaminated portions of the property during the Defendants' ownership or operation of the site. Discing, in contrast to the *Kaiser Alumi-*

*num* scenario, had a different object and a benign effect. Discing is a method used for weed abatement. It does not involve substantial horizontal movement of soil. The primary effect is to churn the top couple of inches of soil into something of a homogenous mix, thus vertically redistributing top soil to a limited degree. It is not a typical disposal activity but an agricultural activity and a fire prevention measure. *Autery v. United States*, 424 F.3d 944 (9th Cir.2005). It can be contrasted with another agricultural activity known as "deep ripping." "Deep ripping" involves dragging long metal prongs, four to seven feet long, through soil behind a tractor or bulldozer, which disgorges soil that is then dragged behind the ripper. *Borden Ranch Partnership v. United States Army Corps of Engineers*, 261 F.3d 810, 812 (9th Cir.2001), *aff'd*, 537 U.S. 99, 123 S.Ct. 599, 154 L.Ed.2d 508 (2002) (If deep ripping is done in a vernal pool or waterway, it could be characterized as discharging a pollutant for purposes of the Clean Water Act). No federal court has addressed the question of whether discing (for weed abatement, fire prevention, or otherwise) constitutes a "disposal" for purposes of CERCLA. It is interesting to note, however, that Chapter III of the *Best Management Practices for Lead at Outdoor Shooting Ranges*, published by the Region 2 office of the Environmental Protection Agency, contains an extensive discussion on the advantages of lead recycling and methods of recycling.[28] It notes however, that "excessive or unmaintained vegetative cover can interfere with reclamation activities."[29] The practicalities of operating a trap and skeet range, even one

using best management practices, requires some element of an "affirmative act" by range operators—including lead recycling and vegetation maintenance. However, these types of "affirmative acts" are *not* the types of affirmative acts which evidence "operations having to do with the leakage or disposal of hazardous waste." *United States v. Bestfoods*, 524 U.S. 51, 67, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (describing the type of operations which lead to operator liability under CERCLA). Therefore, this Court finds that routine discing of range soil for purposes of vegetation maintenance, even when vertical or horizontal redistribution of lead on the site occurs, is not a "disposal" of a hazardous "waste" for purposes of CERCLA and does not trigger PRP liability under § 9607(a)(2) or (3). Therefore, all Defendants are entitled to summary judgment on this ground.

### d. Summary of Additional Grounds for Summary Judgment

Beyond finding that the site is not a "facility," all Defendants are entitled to summary judgment on Plaintiffs' CERCLA claims for three additional reasons: (1) there is no genuine issue as to the fact that no "release or threatened release" of a hazardous substance took place during any of the Defendants' past ownership or operation of the site, and a release is an essential element of Plaintiffs' CERCLA claims; (2) Plaintiffs' CERCLA claim for future response costs is unripe; and (3) there is no genuine issue as to the fact that there was no disposal of hazardous waste at the site while any of the Defendants owned or

---

**28.** *See http://www.epa.gov/region02/waste/leadshot/bmp4_7.pdf* (visited July 14, 2006), at Chapter III, pgs 11–18. The *Best Management Practices* manual is also attached at Exhibit 5 to the Declaration of James H. Colopy in Support of Plaintiffs' Response to May 10, 2006 Order for Supplemental Summary Judgment Briefing (filed May 31, 2006). However, Plaintiffs' exhibit contains only Chapter I. Chapters II and III may be found at the EPA's website.

**29.** *Id.* at *Best Management Practices*, Chapter III, at 16.

operated the range, and a "disposal" of a "waste" is an essential element for finding any Defendants to be liable as CERCLA PRPs. Therefore, all Defendants are entitled to summary judgment on Plaintiffs' CERCLA claims.

## B. *RCRA*

In their other federal claim (the third claim for relief), Plaintiffs seek an injunction under the citizen suit provision of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B). Plaintiffs claim that the lead shot and target debris is a hazardous "solid waste" covered by RCRA and that it posed, and continues to pose, an "imminent and substantial endangerment to health or the environment." *See* § 6972(a)(1)(B). Because this Court finds that there is no genuine issue of material fact as to whether clay target debris and lead from ammunition used as it is intended at a shooting range is not "solid waste," summary judgment is warranted for all Defendants.

According to the Supreme Court, "RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 483, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). Chief responsibility for the enforcement of RCRA rests with the EPA, but § 6972(a) permits private citizens to seek injunctive relief either restraining responsible parties from further violating RCRA or ordering responsible parties to take actions necessary for site remediation. *Id.* at 483–84. RCRA does not provide for past cleanup costs to be awarded to a private plaintiff. *Id.* at 488. Moreover, § 6972(a)(1)(B) relief is only available where a site poses a present (not a past) "imminent and substantial" danger. *Id.*

### 1. "Solid Waste" as defined by RCRA

In order for RCRA to apply, there must be "hazardous waste" and "hazardous waste" is a subset of "solid waste." *See,* 42 U.S.C. § 6903(5). The term "solid waste," in turn, is defined by RCRA § 6903(27) as follows:

> The term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and *other discarded material,* including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 or Title 33, or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended. (Emphasis added.)

The only part of the "solid waste" definition that could conceivably apply to spent ammunition and target debris at a shooting range is the phrase "other discarded material."

### 2. "Discarded Material" under RCRA

RCRA does not further define "discarded material." *Safe Air For Everyone v. Meyer,* 373 F.3d 1035, 1041 (9th Cir.2004), *cert. denied,* 544 U.S. 1018, 125 S.Ct. 1973, 161 L.Ed.2d 856 (2005). In *Safe Air,* the Ninth Circuit faced the question of whether grass residue in a farm field was a RCRA "solid waste." *Id.* To answer that question the court had to answer the related question of whether burnt filed grass had been "discarded." The EPA has apparently not promulgated a Rule addressing farm field grass residue. Consequently, the Ninth Circuit gleaned three factors

from "extra-circuit" decisions bearing on how to determine when a substance is "discarded," and thus, a "solid waste" for purposes of RCRA. *Id.* at 1043 ("we will also evaluate: (1) whether the material is 'destined for beneficial reuse or recycling in a continuous process by the generating industry itself,' (2) whether the materials are being actively reused, or whether they merely have the *potential* of being reused, (3) whether the materials are being reused by its original owner, as opposed to use by a salvager or reclaimer") (citations omitted) (emphasis in original). Ultimately, the Ninth Circuit held that under the ordinary meaning of the term "discard," Kentucky bluegrass residue left in farm fields and burnt by farmers was not "discarded" and thus not within the RCRA definition of "solid waste." *Id.* at 1047.

### 3. The EPA Military Munitions Rule

In the case of ammunition, however, the EPA has adopted a formal Rule. While the Military Munitions Rule does not speak directly to whether CERCLA applies to a shooting range, it does address the question under RCRA. In the Rule, the EPA concludes that when ammunition is used as intended, the deposit of lead onto a site does not constitute the act of "discarding" the lead and that as a result, the lead does not become "solid waste" as defined by RCRA. 62 Fed.Reg. 6622, at 6626–30. Section G of the Rule states, "Military munitions, under today's final rule, are not a solid waste for regulatory purposes: (1) when a munition is used for its intended purpose...," and "[u]nder RCRA, the use of products for their intended purpose, even when the use of the product results in deposit on the land, does not necessarily constitute 'discard,' is not waste management, and is not subject to regulation." *Id.* at 6628. The Agency explains its interpretation further in response to public comments to the proposed Rule. The Munitions Rule states,

*In EPA's opinion, the use of munitions does not constitute a waste management activity because the munitions are not "discarded." Rather, the firing of munitions is within the normal and expected use of the product.* This is the same position EPA took regarding the discharge of ammunition and expended cartridges in an interpretive letter by Sylvia Lowrance, Director of EPA's Office of Solid Waste, to Jane Magee, Assistant Commissioner for Solid and Hazardous Waste Management, Indiana Department of Environmental Management, Sept. 6, 1988, addressing the issue of the "applicability of RCRA regulations to shooting ranges." This position was also repeated in the proposed rule for Corrective Action for Solid Waste Management Units at Hazardous Waste Management Facilities, 55 Fed.Reg. 30798, 30809 (1990). At the request of the United States Court of Appeals for the Second Circuit, EPA filed a brief as Amicus Curiae in *Connecticut Coastal Fishermen's Assoc. v. Remington Arms Co., et al,* (August 28, 1992) discussing the Agency's views on whether lead shot and clay target debris deposited on land and in water in the normal course of skeet and trap shooting is "solid waste" under RCRA. In that brief, EPA repeated its position that regulatory jurisdiction does not apply to products that are deposited onto the land in their ordinary manner of use.

EPA sees no compelling reason to alter this longstanding interpretation of its regulatory definition of the term "solid waste...."

Moreover, EPA disagrees with one commenter's proposition that munitions are a "solid waste" when they hit the ground because they have no further function, unlike pesticides, which continue to have a function on the ground.

*EPA's interpretation focuses on whether a product was used as it was intended to be used, not on whether the purpose of the product is to perform some function once on the ground.* For example, the use of explosives (e.g., dynamite) for road clearing, construction, or mining does not trigger RCRA regulation, even though any residuals on the ground serve no further function.

*Therefore, the Agency is maintaining its position that munitions that are fired are products used for their intended purpose, even when they hit the ground since hitting the ground is a normal expectation for their use.* However, today's rule specifies that fired military munitions that land off-range become a statutory solid waste at a certain point, potentially subject to RCRA remedial authorities.

*Id.* at 6630 (emphasis added). The EPA's rules and regulations are due considerable deference, (*A & W Smelter,* 146 F.3d at 1111), and this particular Rule has been upheld by the District of Columbia Court of Appeals. *See, Toxics Project,* 146 F.3d at 955 and note 13, *supra.*

 Deferring to the EPA's expertise, lead shot and target debris are not "discarded" because at a shooting range they are used as intended. Because they are not "discarded," they do not come within the RCRA definition of "solid waste." Because the lead shot and target debris is not "solid waste," it does not qualify as "hazardous waste" and instead falls outside the ambit of RCRA. That conclusion is consistent with the majority of the five court decisions which have addressed RCRA allegations in the context of firing ranges.

### 4. Other decisions considering RCRA's application to shooting ranges

In *Simsbury–Avon Preservation Society, LLC v. Metacon Gun Club,* Case No. 3:04cv803 JBA, 2005 WL 1413183 (D.Conn. Jun.14, 2005), the court deferred to the EPA's consistently held position that lead shot at a shooting range is not abandoned and thus not within RCRA's definition of "solid waste" and granted a motion to dismiss a RCRA claim. The court writes,

This Court concludes that the EPA's interpretation excluding lead shot and bullets from the definition of "solid waste" is reasonable. At the time a target shooter fires a bullet, the shooter is not intending to "abandon" the bullet, but rather to use it to hit a target. He or she is putting the lead bullet to its intended use. At some point after the bullet is left on the ground or in the water it may become "discarded" and subject to RCRA's remediation provisions.... However, a shooter is not engaged in the abandonment of hazardous waste at the time the shot is fired....

*Id.* at *6 (citations omitted).

In *Water Keeper Alliance v. United States Department of Defense,* 152 F.Supp.2d 163, (D.P.R.2001), *aff'd,* 271 F.3d 21 (1st Cir.2001), the court again deferred to the EPA's interpretation (including the Military Munitions Rule) and held that ammunition does not become hazardous "solid waste" and dismissed the RCRA claim that firing ordnance constitutes disposal of a hazardous waste which presents an imminent and substantial endangerment. *Id.* at 169. The court held,

Thus, RCRA does not support Plaintiff's contention that munitions become discarded material immediately upon being fired. Not being discarded material, these munitions cannot be considered solid waste. Accordingly, the Court hereby dismisses Plaintiff's claim that Defendants' firing of ordnance onto the LIA [landing impact area] constitutes *"disposal of any solid or hazardous waste* which may present an imminent

and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

*Id.* (emphasis in original).[30]

In *Long Island Soundkeepers Fund, Inc. v. New York Athletic Club of the City of New York,* Case No. 94 Civ. 0436(RPP), 1996 WL 131863 (S.D.N.Y. Mar.22, 1996), the court granted summary judgment on RCRA claims in favor of a trap and skeet range that had operated for sixty years. The case was decided prior to the EPA's adoption of the Military Munitions Rule, but the EPA filed an amicus brief in which it took the same position. "[T]he EPA urges the Court to conclude that shot and target fragments do not constitute 'solid waste' within the meaning of the regulations promulgated under RCRA." *Id.* at *8. That court found the EPA's interpretation[31] to be entitled to deference and held that "[s]pent shot and target fragments do not, therefore, fall within the regulatory definition of 'solid waste' under RCRA." *Id.*

In *Connecticut Coastal Fishermen's Association v. Remington Arms Co., Inc.,* 989 F.2d 1305 (2nd Cir.1993), RCRA claims were brought against a trap and skeet range that had been used for 70 years. Over time, 5 million pounds of lead shot and 11 million pounds of clay target debris had collected around the club and in the waters of Long Island Sound. *Id.* at 1308. The EPA, again as amicus, offered its opinion that "lead shot and clay targets discharged by patrons of Remington's Gun Club do not fall within the narrow regulatory definition of solid waste." *Id.* at 1315. The court deferred to the agency's interpretation of the regulatory definition of solid waste, but distinguished between the regulatory definition and the statutory definition.[32] The court then concluded that however much time must pass for spent ammunition to be considered discarded, and therefore solid waste, 70 years was a sufficiently long time. Wrote the court, "[w]ithout deciding how long materials must accumulate before they become discarded—that is, when the shot is fired or at some later time—we agree that the lead shot and clay targets in Long Island Sound have accumulated long enough to be considered solid waste." *Id.* at 1316.

In *Potomac Riverkeeper, Inc. v. National Capital Skeet and Trap Club, Inc.,* 388 F.Supp.2d 582 (D.Md.2005), the case Plaintiffs rely on, the court treated lead shot as "discarded" and therefore as "solid waste." *Id.* at 587. It denied summary judgment finding a genuine dispute as to whether lead shot posed an imminent and substantial endangerment to health or the environment. *Id.* at 589. The case is not persuasive here because it makes no mention of the EPA Military Munitions Rule or the EPA Region 2 Best Practices Manual or the deference due the EPA's interpretation. Moreover, the decision does not identify or consider the three most recent shooting range cases, *Metacon Gun Club, Water Keeper Alliance,* and *Long Island Soundkeeper Fund,* and only brief-

---

**30.** The defendants did not seek dismissal of, and the court had no opportunity to address, a separate claim that if munitions were left to accumulate they would become solid waste. *Id.* at n. 6.

**31.** The court further described the EPA's position as follows: "[s]pent rounds of ammunition and target fragments are not, the EPA asserts, 'discarded material' within the meaning of he regulation, because they have not been 'abandoned' as the term is defined in the above cited regulation." *Id.*

**32.** The distinction has been criticized by other courts. *E.g., Safe Air,* 373 F.3d at 1046, n. 14; *Water Keeper Alliance,* 152 F.Supp.2d at 168 ("... [B]oth definitions contain the term discarded material. Thus, any definition of discarded material, even if provided by the MMR [Military Munitions Rule], is instructive.").

ly mentions the *Remington Arms* decision.[33] Finally, on the question of whether spent ammunition falls within the statutory definition of "solid waste," the *Potomac* decision characterizes the Ninth Circuit's *Safe Air* decision as having already decided that "lead shot is a solid waste because it has been abandoned." *Potomac*, 388 F.Supp.2d at 587 ("The phrase 'other discarded material' has been interpreted to include material that has been disposed of thrown away or abandoned, such as lead shot. *See Safe Air v. Meyer*, 373 F.3d 1035, 1042 (9th Cir.2004) (lead shot is a solid waste because it has been abandoned)."). *Safe Air*, however, was not a case about lead shot. *Safe Air* addressed the question of Kentucky bluegrass residue left in farm fields and burned for agricultural purposes. *Safe Air*, 373 F.3d 1035, 1046 (9th Cir.2004) (concluding that "the burning of bluegrass residue by farmers is not the evil against which Congress took aim").

### 5. Applying Deference to EPA interpretation of RCRA

In view of the deference due EPA's interpretation that spent ammunition and target debris is not "solid waste" and the cases addressing shooting ranges, this

Court concludes that the shooting range site in this case does not contain hazardous solid waste as the term is used in RCRA. Therefore, Defendants are entitled to summary judgment on Plaintiff's RCRA claim.

### 6. No genuine issue of material fact evidencing shot is "solid waste"

 Alternatively, notwithstanding the EPA interpretation, even if spent ammunition may change to "solid waste" over 70 years if left untouched (as suggested by the *Remington Arms* court), there is no evidence that lead has simply been left to accumulate and abandoned by Defendants since the shooting range opened in 1965. On the contrary, there is no genuine issue of material fact that Defendants have, at various times over the years of the range's operation, culled and recycled the lead shot from the range soil.[34] Thus, the undisputed evidence indicates that the lead shot had been reclaimed on several occasions. When one applies the three considerations outlined by the Ninth Circuit in *Safe Air*, the conclusions suggest that the spent ammunition is not a "solid waste" under the statutory definition of RCRA. 373 F.2d at 1043 (applying the three enumerated considerations yields these con-

---

**33.** *Remington Arms* is cited for the proposition that while the endangerment must be ongoing, the conduct that created the endangerment need not be. *Potomac*, 388 F.Supp.2d at 589.

**34.** *See* Declaration of Ray Enniss (filed May 31, 2006) ("From 1990 to 1997, I owned and ran a trap and skeet club...on the property at issue in this lawsuit....I periodically had the shot harvested off of the Target Tossers' ranges and resold some of it as reclaimed shot to customers who reloaded their own shotgun shells....we harvested over 150,000 pounds of shot."); *see also* Deposition of Phil Gordon Scott attached to Supplemental Brief and Declaration of Walter B. Hill, Jr. (filed May 31, 2006) (managed range from 1969 to 1978; hired contractors to remove lead pel-

lets in 1971, 1973, 1975 and 1977; shooters could purchase reclaimed shot to reload own shells). Plaintiffs object to these two declarations. *See* Plaintiffs' Objections to Evidence and Legal Arguments in Defendants' Supplemental Briefs Beyond Scope of Court's May 10, 2006 Order (filed June 7, 2006). The objections are not to the quality of the evidence or the relevance of the evidence. More importantly, the objections do not suggest that there is, or might be, evidence which would create a genuine issue about periodic lead recycling activities on the shooting range. Moreover, Plaintiffs do not seek an extension under Rule 56(f) Fed.R.Civ.P. so that they may present contrary evidence. Therefore, the objections are overruled and the declarations are considered. Rule 1 Fed. R.Civ.P.

clusions: (1) the lead shot was "destined for beneficial reuse or recycling in a continuous process by the generating industry itself;" (2) the lead shot [was] "being actively reused;" and (3) the lead shot was "being reused [in some cases] by its original owner, as opposed to use by a salvager or reclaimer.").[35] Therefore, Defendants are entitled to summary judgment on Plaintiffs' RCRA claim.

## C. PENDANT JURISDICTION

 Plaintiffs' only federal claims are the CERCLA and RCRA claims. While they also seek declaratory relief, the federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), does not confer federal court jurisdiction by itself. The Act was not meant to create a new basis for jurisdiction, but instead to create a new remedy where jurisdiction already exists. *Lear Siegler, Inc. v. Adkins*, 330 F.2d 595, 599 (9th Cir.1964) (*citing Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950)).

Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over state law claims under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction. Whether or not a federal court should exercise pendant jurisdiction over a state law claim is left to the discretion of the court.

The method of determining whether or not to retain jurisdiction over state law claims was set forth in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The Court reiterated that "[p]endant jurisdiction is a doctrine of discretion, not of plaintiff's right." *Id.* at 726. In the situation where the "federal claims are dismissed before trial...the state claims should be dismissed as well." *Id.* at 727; *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 349, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). The Ninth Circuit has consistently ruled that when federal claims are dismissed it is within the court's discretion to dismiss the state law claims, and that in the usual case the state claims will be dismissed. *Notrica v. Board of Supervisors*, 925 F.2d 1211, 1213–14 (9th Cir.1991); *see also Bryant v. Adventist Health System/West*, 289 F.3d 1162, 1169 (9th Cir.2002).

Since Defendants are entitled to summary judgment on both federal claims and there is no other basis for original federal jurisdiction, the Court declines to retain jurisdiction over the remaining state law claims and dismisses the action in its entirety.

## V. CONCLUSION

All defendants are entitled to summary judgment on Plaintiff's CERCLA and RCRA claims. The Court declines to exercise jurisdiction over the remaining state law claims and dismisses the remaining action in its entirety.

**IT IS SO ORDERED.**

---

**35.** One could posit that *if* there has been no lead reclamation since 1998 when Plaintiffs purchased the site, that the lead has now accumulated long enough to be considered "discarded" and thus a RCRA "solid waste." However, this would lead only to the Plaintiffs' own potential RCRA liability. It would not change the character of the shot accumulated during the Defendant's operations into "solid waste" during the time period when Defendants were involved. In other words, Plaintiffs cannot through their own inaction change the characterization of spent munitions into "solid waste" so as to visit RCRA liability on prior shooting range owners and operators who actively reclaimed the shot from the site. More importantly, the evidence is clear that Plaintiff Otay Land Company did reclaim 42,000 lbs. of lead in 2000.